# IN THE OREGON TAX COURT

## ERNST BROTHERS CORPORATION
*v.*
## DEPARTMENT OF REVENUE
(TC 3410)

Neil R. Byrant, Holmes, Hurley, Bryant, Lovlien & Lynch, Bend, represented plaintiff.

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered November 9, 1993.

**CARL N. BYERS, Judge.**

Plaintiff appeals the 1991 assessed value of the town of Gilchrist, located on Highway 97 in northern Klamath County. Plaintiff's shareholders are three brothers and a sister who are descendants of the Gilchrist family.

The town was built in 1937-39 in connection with the construction of a sawmill. The Gilchrist family envisioned a substantial community, providing its employees with housing and associated amenities. Gilchrist Timber Co. (Gilchrist) owned and operated the town until 1990 when it sold its timberland, mill and town.

The subject property consists of 76.44 irregularly shaped acres located on both sides of the highway. There are 130 individual houses, ranging from one to four bedrooms, and poor to excellent quality. There are two duplexes and six apartment units. A commercial area, commonly called the "mall," includes a restaurant, tavern, bowling alley, grocery store, beauty shop, gift shop, theater, library, post office, laundromat and service station. There is also a fire station, a state police office and a Methodist church. The subject property includes a water and sewer system, streets and street lighting and other outbuildings.[1]

In 1990, Gilchrist decided to sell its major assets. Those assets consisted of approximately 100,000 acres of timberland, a short-line railroad, the mill and the town. Gilchrist hired a major bank to market the assets as a package. The bank developed a prospect list of 116 different entities. Timber was the dominant asset, therefore most prospective buyers were timber or wood products companies. The prospects were far-ranging in size, nature and location. Several of the prospects were located in Canada and one in Hong Kong.

Gilchrist received nine proposals, ranging in price from $65,000,000 to $168,000,000. Only one proposal allocated prices for all the major assets and that proposal indicated a price for the town of $500,000. Crown Pacific, Ltd. (Crown Pacific) became the most serious prospect and eventually agreed to buy all of the assets for $136,500,000. However, Crown Pacific did not want the town. Gilchrist would not sell its assets without the town.

Plaintiff approached Crown Pacific with a proposal to buy the town. Crown Pacific initially asked $2,000,000. Plaintiff offered $500,000. Crown Pacific also tried to interest outside investors, but was unsuccessful. After several months, Crown Pacific agreed to sell the town for $500,000 cash. The sale closed October 4, 1990.

Plaintiff's motivation for purchasing the town was mixed. The shareholders of plaintiff are four descendants of

---

[1] The town also boasts a public school of approximately 400 students (kindergarten through twelfth grades) and a Catholic church but those two properties are separately owned and are not part of the property under appeal.

the Gilchrist family who had grown up in the town and have sentimental feelings for it. They were concerned that, even if Crown Pacific purchased and operated the town, a closure of the mill might cause its demise. They were also motivated by the fact that their ownership would continue to provide housing and employment for at least one of the shareholders. In addition, they felt the purchase of the town was a good investment.

Plaintiff's appraiser used both the sales comparison approach and the income approach. In the sales comparison approach he found three sales. Two of the sales were former air force installations, one near Condon in Gilliam County, and one near North Bend in Coos County. The Condon radar facility had 23 houses, office buildings and other buildings equivalent to commercial facilities. The North Bend station had 27 houses and a similar assortment of buildings. Both of these properties were small towns containing their own water system, sewer system, streets and street lights. In the appraiser's opinion, both sales were speculative in nature. The Condon property sold several times for prices ranging from $126,656 to $400,000. The North Bend property, with a far better location, sold in October, 1989, for $247,789. However, the purchaser also had to expend about another $100,000 to connect the sewer.

Plaintiff's third comparable sale was the sale of the former Rajneeshpuram located 12 miles from Antelope. This property sold in 1991 for $3,650,000. That sale included 64,000 acres of land. In *Connecticut General Life Ins. Co. v. Dept. of Rev.*, 12 OTR 461 (1993), this court determined the true cash value of the town, which contained 2,119 acres, was $436,000. That property, although it included all the facilities for a town of 3,000, could only support agricultural use and sold as such.

Based on these sales, plaintiff's appraiser concluded that the sale of complete towns is "speculative." He concluded that the recent sale of the subject property is the most convincing evidence of its value.

Plaintiff's appraiser also performed an income approach. He projected an annual income of $528,180, less 10 percent vacancy and credit loss, for an effective gross income

of $475,362. Using operating expenses of $356,746,[2] he derived a net income of $118,616. When divided by a 20 percent overall capitalization rate, this indicates a value of $593,080. However, plaintiff's appraiser projected that the town would need additional capital expenditures of approximately $500,000. If plaintiff were required to have a total capital cost of $1,000,000 ($500,000 purchase price plus $500,000 capital expenditures), its projected net income would constitute only a 10 percent return.

Defendant's position was presented by two appraisers. The first performed a cost approach analysis. That appraiser found a land value of $553,200 based on land sales in nearby areas. She valued the commercial land based on sales of commercial land per square foot and the residential land on a per-site basis, finding $3,000 per site plus $500 for development costs.

This appraiser used defendant's cost factor books to determine the value of the commercial and residential improvements. After estimating depreciation, she found a value for the improvements of $2,206,800. This reflects an allowance of "additional" depreciation because the subject cannot easily be subdivided. The appraiser indicated that since there was no specific data, the depreciation was based on her judgment. Her estimate of depreciation does not reflect any risk related to the possible closure of the mill.

Defendant's other appraiser performed an income approach. He first determined economic rents for the commercial and residential property by surveying actual rents in other areas. Using those economic rents, he determined a total effective gross income, after vacancy and credit losses, of $565,338. He then deducted expenses of $195,029, realizing a net income of $370,309. He divided the net income by an overall capitalization rate of .1496 (including property taxes) to derive an indicated value of $2,475,300 (rounded).

Defendant's appraisers derived indicated values of $2,475,300 by the income approach and $2,760,000 by the cost approach. They reconciled these indications to an opinion of value of $2,504,000.

---

[2] These operating expenses reflect extraordinary maintenance expenses including payroll for employees.

There are several disputes between the parties. The first dispute is whether the sale of the subject property is a valid indication of its value. Defendant contends the sale was not an arm's-length transaction. Defendant points to the family relationship between plaintiff's shareholders and some of the shareholders of Gilchrist, and a strong family tradition or historical relationship. However, the uncontradicted evidence was that Gilchrist would not sell the town separately. For whatever reasons, it required the town to be included as part of the asset sale package. This position was apparently a problem for more than one prospective buyer. The prospective buyers interested in buying the timberland and the mill were not interested in buying the town. The president of Crown Pacific testified that Crown Pacific had no expertise in operating this kind of property, there was deferred maintenance in the buildings, environmental concerns, and, if the mill closed, then the town would have zero value.

Defendant's position necessarily implies that Gilchrist gave plaintiff approximately $2,000,000 in value after it became apparent there were few, if any, buyers for the property. However, there is no evidence to support such an inference. Plaintiff did not negotiate with Gilchrist but rather with Crown Pacific. After several months of negotiation, plaintiff made a "final offer" to Crown Pacific, which Crown Pacific considered for some time before finally accepting. The evidence indicated that once Crown Pacific decided to buy the assets, it unsuccessfully tried to find a buyer for the town.

Defendant's appraisers also indicated they did not believe the property was adequately exposed in the marketplace. The town was part of the package offered by Gilchrist and was on the market for 14 to 18 months. The bank, trying to market the property, had no reason to restrict its search. The subject property is unique and its proposed sale attracted attention of the news media. This kind of free advertising reached a large market area. There is no reason to believe the real estate market, including developers and speculators, was unaware of the offering. Defendant's appraisers speculated about other possible uses of the property but such speculation was unsupported by any evidence or data.

The evidence showed that 80 percent of the residential tenants are connected with the mill. Although the average vacancy rate is not high (six percent), the turnover rate increased substantially after the mill changed hands. Increased turnover for a landlord requires more maintenance and results in higher credit and vacancy loss. If the mill closed, the current residential tenants would become unemployed. The distance to other areas of employment reasonably suggest that many tenants would move. Defendant's appraisers testified that they valued the property as they did because the mill was operating in 1991. However, an investor purchasing the property as of July 1, 1991, would certainly consider the risk that the mill would close when the current timber supply is exhausted. At the current cutting rate, this may occur as early as 1996. This threat constitutes a substantial risk with regard to the value of the subject property.

Plaintiff has four, full-time employees to maintain and operate the town. Defendant's appraiser "disallowed" many of these expenses because he felt the town could be operated with a lesser number of employees at lesser cost. However, the appraiser did not support this position with anything other than his opinion. Plaintiff now uses fewer employees than when the property was owned by Gilchrist. Further, Gilchrist subsidized the operation of the town to the extent of $200,000 to $400,000 per year. The buildings are approximately 54 years old. Considering the fact that plaintiff is operating a town, it is to be expected that maintenance and operating costs may be higher than for other rental properties.

Defendant's use of "economic rents" assumes plaintiff is not trying to maximize its income. Plaintiff has raised the rents and is a prudent manager. Defendant's estimates of economic rents are based on surveys of other areas such as Klamath Falls. Those areas fail to reflect the unique character and locational attributes of this property. Also, defendant estimated the rent for the grocery store area without regard to the gross sales of the store. This ignores a fundamental consideration of commercial properties, whether paying a fixed or percentage rent. It is worth noting that the actual gross income for the subsequent calendar year of 1992 was $432,591. For that year, plaintiff reported expenses of

$426,246 (including $61,441 of depreciation) realizing a net income of $6,345.

Defendant's appraiser acknowledges that the subject property is "unique" and there is none other like it. Nevertheless, he believes the value is substantially more than plaintiff paid for it. His opinion is based on market data drawn from other areas.

Plaintiff's appraiser also recognizes the property is unique. However, he perceives far less value. He cited the examples of Valsetz and Kinzua, both lumber company towns that were demolished when the mills closed. He noted that both of those towns were located in tree farms and, therefore, were a potential threat to the forests. Here, the subject property is not located in a tree farm but its location is remote.

Plaintiff's appraiser sees great risk if the mill were to close. Based on the rate that Crown Pacific is cutting the timber, the mill may close by 1996. The appraiser selected a 20 percent capitalization rate to reflect the risk associated with this closure. However, the appraiser submitted no substantiating data or information. It may be that the capitalization rate should be 15 percent or 35 percent.

The unique nature of this property makes application of the traditional methods of valuation difficult. Most of the improvements are over 50 years old. Since defendant's estimates of depreciation for functional and economic obsolescence are not based on market data, the cost approach appears useless. Where towns are demolished or sell for less than one percent of the cost of the improvements, cost as a measure of value is not meaningful.

■ Since all of the properties, except the Methodist church, may be viewed as income properties, it would appear the income approach should render a valid indication of value. However, the risk of mill closure and its consequences throws a wet blanket over that approach. The separation of the ownership of the mill and the timber from ownership of the town places the fate of the town in real doubt.

■ Finally, in the sales comparison approach, location is everything. Neither party adduced evidence that provided

reliable guidance on the values associated with this location. Some towns are demolished, some speculate and some thrive. On the whole, the sale of the subject property, some eight or nine months before the assessment date, is the best evidence of its value. The public was well aware that a whole town was for sale. The seller's agent-bank, Crown Pacific, and plaintiff all attempted to interest other investors without success. While common sense may indicate that extensive improvements should have significant value, it also recognizes that old improvements without a marketable use may be worthless hulks along the highway. The court finds the real market value of the subject property as of July 1, 1991, was land, $100,000; improvements, $400,000; total, $500,000.

Plaintiff to recover costs and disbursements.