Argued and submitted September 9, judgment of the Tax Court affirmed
October 27, 1994

# ERNST BROTHERS CORPORATION,
*Respondent,*

*v.*

# DEPARTMENT OF REVENUE,
State of Oregon,
*Appellant.*

# (OTC 3410; SC S40938)
882 P2d 591

Carl N. Byers, Judge.

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause for appellant. With her on the briefs was Theodore R. Kulongoski, Attorney General.

Neil R. Bryant, of Holmes, Hurley, Brant, Lovlien & Lynch, Bend, argued the cause for respondent. With him on the brief was Kevin J. Keillor.

GRABER, J.

## GRABER, J.

This case involves the valuation, for ad valorem tax purposes in the tax year 1991-92, of the town of Gilchrist. The Tax Court concluded that the real market value of the town was $500,000. *Ernst Brothers Corp. v. Dept. of Rev.*, 12 OTR 527, 534 (1993). On *de novo* review, ORS 305.445, we affirm.

■■ The Department of Revenue (department) contends that the Tax Court's valuation is too low and that the 1991-92 real market value of the property was in excess of $2 million.[1] The department has the burden to show, by a preponderance of the evidence, that its valuation best reflects the value of the property. *See* ORS 305.427 (establishing burden of proof); *see also Union Pacific Railroad v. Dept. of Rev.*, 315 Or 11, 17, 843 P2d 864 (1992) (on *de novo* review of a decision of the Tax Court, the party making the claim that would require modification of a decision of the Tax Court has the burden of proof by a preponderance of the evidence). The determination by this court of the value of real property for ad valorem tax purposes is a factual one, based on the record. *Brooks Resources Corp. v. Dept. of Revenue*, 286 Or 499, 503-04, 595 P2d 1358 (1979).

The town of Gilchrist is located on Highway 97 in northern Klamath County. Gilchrist was built during the years 1937 to 1939, in connection with the construction of a sawmill. Since its creation, it has been a "company town." Gilchrist Timber Company (Gilchrist Timber) owned and operated the town until 1990.

The property consists of 76.44 irregularly shaped acres located on both sides of the highway. There are 130 individual houses, ranging in size from one to four bedrooms and ranging in quality from poor to good. There are two duplexes and a six-apartment unit. A commercial area, referred to by local residents as "the mall," includes a restaurant, tavern, two-lane bowling alley, grocery store, beauty salon, gift shop, theater, library, post office, laundromat, and service station. The town has a fire station, a state police

---

[1] Both parties agree that this court should assess the town as a unit, rather than by its constituent parts. All the evidence in the record is based on that premise.

office, and a church. The property includes water and sewer systems, streets and street lighting, and other outbuildings.[2]

In 1990, Gilchrist Timber decided to sell its major assets, as a package in a single sale. Those assets consisted of approximately 100,000 acres of timberland, a short-line railroad, the sawmill, and the town of Gilchrist. Gilchrist Timber hired a major bank to market its package of assets. Gilchrist Timber received nine proposals for the package of assets, ranging in price from $65 million to $168 million. Only one proposal (from Rough 'n Ready Lumber Company) allocated a price to the town, and that allocated price was $500,000. Crown Pacific, Ltd. (Crown Pacific), emerged as the most serious prospect, and eventually it agreed to buy all the assets, in a single transaction, for $136 million. Although Crown Pacific did not want the town of Gilchrist, Gilchrist Timber refused to sell its assets without selling the town as part of the package.

Ernst Brothers Corporation (Ernst Brothers) negotiated with Crown Pacific to buy the town. Crown Pacific and Ernst Brothers eventually agreed on a price of $500,000, and the sale closed in October 1991. The Tax Court concluded that that sale was the only usable evidence in the record of the value of the town of Gilchrist for tax year 1991-92. 12 OTR at 533-34. The Tax Court found that price to be the real market value of the town and ordered the Klamath County assessor to assess the town at $500,000. *Id.* at 534. The department appealed and now argues that the 1991-92 value of the town, as a unit of property, was over $2 million.

ORS 308.205(1) provides:

> "Real market value of all property, real and personal, as the property exists on the date of assessment, means the minimum amount in cash which could reasonably be expected by an informed seller acting without compulsion from an informed buyer acting without compulsion, in an arm's length transaction during the fiscal year."

"Real market value" is to be determined by the "methods and procedures" set out by the department. ORS 308.205(2). Two of the department's rules are relevant here. OAR

---

[2] The town also has a public school and another church; those two properties are separately owned and are not part of the property under consideration here.

150-308.205(A)(2)(a) requires that three methods of valuation — the sales comparison approach, the cost approach, and the income approach — be considered, even if all three do not apply to a given property.[3] OAR 150-308.205(A)(2)(c) provides that, if the sales comparison approach is used, only "arm's-length transactions" that result in sales of properties comparable to the assessed property may be considered.[4]

■     Two appraisers testified on behalf of the department in the Tax Court. The first appraiser performed a cost analysis, and the second performed an income analysis; both concluded that Gilchrist was worth more than $2 million. On appeal, the department argues that the Tax Court improperly rejected the income approach presented by its second appraiser. We disagree.

The department's second appraiser determined economic rents for the commercial and residential properties by surveying actual rents in other areas of the state. Using those rents, he determined a total effective income, after credit and vacancy losses; he then deducted expenses and divided the net income by an overall capitalization rate. By that method, he determined that the value of Gilchrist was $2,475,300.

The Tax Court noted that the department's second appraiser failed to take into account the effect that either a mill closure or a reduction in the number of people employed by the mill would have on the value of the town. 12 OTR at 532. The Tax Court stated that, because the department's appraiser considered neither a mill closure nor a work-force reduction, the capitalization rate that he used failed to reflect

---

[3] OAR 150-308.205(A)(2)(a) provides:

"For the valuation of real property all three approaches: sales comparison approach; cost approach; and income approach, shall be considered. For a particular property, it may be that all three approaches can not be applied, however, each shall be investigated for its merit in each specific appraisal."

[4] OAR 150-308.205(A)(2)(c) provides:

"In utilizing the Sales Comparison Approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, shall be used. All transactions utilized in the sales comparison approach shall be verified to insure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction shall not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition."

the business risk associated with the purchase of the town of Gilchrist. *Id.* at 533. As a result, the department's income approach is so significantly flawed that it is not helpful in calculating the value of Gilchrist. *Id.* at 533.

The department argues that the Tax Court "erred in relying on speculative conjecture about future business plans of Crown Pacific, that may only possibly result in mill closure at some future date, as a basis for rejecting [the department's] evidence of value." However, we agree with the Tax Court's criticism of the department's income approach.

Gilchrist is a company town. The town was created for, and exists because of, the timber supply and the mill. The evidence showed that 80 percent of the residential tenants of Gilchrist are connected with the mill. If the mill closes or if its work force is reduced, the economy of the town will be altered dramatically.

The record contains substantial evidence of the risk of a mill closure or a work-force reduction. The department's appraiser testified that, at the current rate of cutting, the timber that Crown Pacific purchased from Gilchrist Timber will be exhausted in 1996 or 1997. The president of Gilchrist Timber offered similar testimony. Once the timber supply disappears, there is no guarantee that the mill will continue to operate. The president of Crown Pacific testified that there was no agreement between Ernst Brothers and Crown Pacific to keep the mill open for any particular period of time. He also testified that, by 1995, Crown Pacific "probably" will reduce the amount of work done at the mill from two shifts to one shift. The president of Gilchrist Timber testified that a reduction from two shifts to one shift would, in turn, probably result in a work-force reduction; he stated that, if a work-force reduction occurs, the effect on the value of the town of Gilchrist will be "drastic[]."

The department presented no credible evidence to contradict the evidence regarding a mill closure or a work-force reduction. We find in accordance with Ernst Brothers' evidence on that point. The threat of a mill closure or a work-force reduction constituted a substantial risk with regard to the value of Gilchrist in 1991. We thus agree with the Tax Court that "an investor purchasing the property as of July 1,

1991, would certainly consider the risk that the mill would close when the current timber supply is exhausted." 12 OTR at 532. The department's appraiser failed to take that risk into account when he conducted his income analysis. Therefore, the income analysis offered by the department is not helpful in calculating the real market value of Gilchrist.

The department's remaining argument is that the sale price of Gilchrist is not persuasive evidence of the market value of the town.[5] We disagree.

■    A recent sale of a piece of real property is persuasive evidence of the market value of that property for assessment purposes. *Kim v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973). In the absence of data indicating that "the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive." *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974). *See also Ward v. Dept. of Revenue*, 293 Or 506, 511, 650 P2d 923 (1982) (sale of assessed property is persuasive, but not conclusive, evidence of property's market value).

Ernst Brothers purchased Gilchrist for $500,000 in 1991. Under normal market conditions, that sale would be persuasive evidence of the value of Gilchrist in 1991 for assessment purposes.

The department does not challenge that general principle. Rather, the department points to OAR 150-308.205(A)(2)(c); that rule provides that, for a sale to be a reliable indicator of market value, the sale must be part of an "arm's-length" transaction. The department argues that, because the transaction relied on here was not at arm's length, "the alternative is to use another approach to value," that is, the income approach or the cost approach.[6]

---

[5] The department does not assign as error the Tax Court's rejection of the cash method and comparative sales analyses offered; therefore, we need not consider whether the Tax Court should have used those methods in assessing the value of Gilchrist. We note, however, that the Tax Court complied with OAR 150-308.205(A)(2)(a) when it considered all the approaches offered by both parties' appraisers and determined that they could not be applied. 12 OTR at 532-34.

[6] At oral argument, the department asserted that OAR 150-308.205(A)(3) also applies. OAR 150-308.205(A)(3) provides:

The department offers five reasons why, in its view, the sale of Gilchrist was not an arm's-length transaction within the meaning of OAR 150-308.205(A)(2)(c). We find none of those reasons persuasive.

■     The department first points to the relationships among the parties to the sale in support of this argument. The shareholders of Ernst Brothers are three brothers — Gil Ernst, Will Ernst, and John Ernst — and their sister, Jan Houck. All four are descendants of the Gilchrist family and grew up in the town. On a combined basis, the four of them own about one percent of Gilchrist Timber. Two of the brothers, Will and John, work for Crown Pacific, although neither was a Crown Pacific employee when the negotiations for the sale of Gilchrist took place. Will was the lead negotiator on behalf of Ernst Brothers for the purchase of Gilchrist.

Crown Pacific never had any interest in buying Gilchrist; it wanted only the timber interests of Gilchrist Timber. Yet, Gilchrist Timber would not sell without an agreement from Crown Pacific to purchase all the assets. When the negotiations for Gilchrist between Ernst Brothers and Crown Pacific began, Crown Pacific's initial asking price was $2,000,000; Ernst Brothers' initial offer was $500,000. Both Will Ernst and the president of Crown Pacific described a three-month negotiation process that, in the absence of evidence to the contrary, was at arm's length. Eventually, Crown Pacific accepted Ernst Brothers' initial offer.

---

"Especial property is property specifically designed, equipped and used for a specific operation or use which is beneficial to only one particular user. This may occur because the especial property is part of a larger total operation or because of the specific nature of the operation or use, but in either case, the improvement's usefulness is designed without concern for marketability. Since a general market for the property does not exist, the property has no apparent immediate market value. Real market value shall be determined by estimating just compensation for loss to the owner of the unit of property through either the cost or income approaches, whichever is applicable, or a combination of both."

The department did not rely on OAR 150-308.205(A)(3) in the Tax Court, or even in its briefs presented to this court. Had the department relied on that rule at trial, Ernst Brothers might well have wished to offer additional or different evidence, because that rule contains a different method of determining real market value than does OAR 150-308.205(A)(2). The department's failure to raise the issue thus denied Ernst Brothers the opportunity to offer such evidence. We think it inappropriate, therefore, to evaluate the evidence that *was* offered at trial by the legal standard that the department now asserts for the first time.

The department argues that, as one-percent owners of Gilchrist Timber, Ernst Brothers had an insider's privilege to the negotiations between Gilchrist Timber and Crown Pacific. It was this privilege that caused Gilchrist Timber to agree to insist on selling the town as part of a package with the timberland and the mill; once the sale was complete, Ernst Brothers could "force Crown Pacific to accept [its] * * * offer for the town."

The record does not support the department's "interrelationship theory." At oral argument, the department conceded that owning one percent of a company's stock, in the absence of some other tie, such as a family tie, is not sufficient to establish an "interrelated corporation[] or person[]" in violation of OAR 150-308.205(A)(2)(c). But the one-percent ownership is the strongest evidence of an "interrelationship" that exists in this record.

None of the shareholders in Ernst Brothers owns any interest in Crown Pacific, nor has any of them ever owned an interest in Crown Pacific. Except for the later-occurring facts that John Ernst *now* manages the mill at Gilchrist and that Will Ernst *now* is a sales person for Crown Pacific, there is no evidence in the record that reveals a "family tie" among Ernst Brothers, Gilchrist Timber, and Crown Pacific. The record reveals no evidence of any "inside knowledge in the transaction negotiations" on the part of the shareholders of Ernst Brothers, nor did the department point to any in the brief or at oral argument.[7] The only evidence on the record that the transaction was between interrelated corporations or persons is the statement by each of the department's appraisers that, because the sales were believed to be between family members or insiders, the transactions could not be at arm's length. But those are conclusions not borne out by the record.

---

[7] Mary Ernst, the mother of the four shareholders in Ernst Brothers and the sister of one of the founders of Gilchrist Timber, owns approximately five percent of Gilchrist Timber. She resides in Gilchrist with the four shareholders in Ernst Brothers. The department argues that, although the one-percent interest of Ernst Brothers may be small, when that one percent is combined with Mary Ernst's "approximately five percent, [their influence] *could have been significant.*" (Emphasis added.) Nothing in the record shows the exercise of any influence, nor can an inference reasonably be drawn from the record that any influence was exercised. The department's argument is speculation.

■ The department's next contention is that Gilchrist Timber, and not Crown Pacific, sold Gilchrist to Ernst Brothers. The department points to the "Statutory Warranty Deed," dated October 2, 1991, that conveyed Gilchrist to Ernst Brothers. That deed is signed by Charles Shotts, President of Gilchrist Timber; Crown Pacific is not mentioned in the deed. The conclusion drawn by the department is that legal title to Gilchrist was always vested in Gilchrist Timber; therefore, no arm's-length transaction for the property could have taken place between Ernst Brothers and Crown Pacific.

■ The evidence in the record does not support the department's argument. Crown Pacific had the sole right to sell the property. Crown Pacific entered into an agreement for the sale of the assets of Gilchrist Timber, including the town, on May 8, 1991. The doctrine of equitable conversion applies; at the time of an agreement to sell real property, the purchaser of the real property is deemed to be the owner thereof, and the seller becomes entitled to receive payment of the purchase price. *Panushka v. Panushka*, 221 Or 145, 149, 349 P2d 450 (1960). The fact that the property was deeded directly from Gilchrist Timber to Ernst Brothers is of no significance. There is no evidence that anyone but Crown Pacific was entitled to sell the land.

The department's third argument is that the town was not marketed adequately; therefore, the transaction is not an "arm's-length market transaction[]." The department's argument is based on the testimony of an appraiser who testified for the department. That appraiser thought that Gilchrist "should have been marketed through the Bay area, Japan, New York, worldwide, and [for] as long as one to five years." She also stated that she spoke with a realtor in LaPine who said that information about the sale of the town was generally unavailable.

■ The evidence, considered in it entirety, does not support the department's argument. The evidence shows that, during the original sale of Gilchrist Timber's assets, Gilchrist Timber marketed all its properties, including the town, through U.S. National Bank. U.S. National Bank contacted or considered over 100 prospective purchasers that included accounting firms, brokerage firms, international investment firms, and timber companies. Moreover, the sale

of the assets of Gilchrist Timber was well publicized by the media.

Before Gilchrist Timber sold the town of Gilchrist to Crown Pacific, Gilchrist Timber received one bid for the package of assets that allocated a price for the town; in that bid, a lumber company allocated $500,000 for the town. The president of Crown Pacific testified that, after the sale from Gilchrist Timber to Crown Pacific, a Crown Pacific employee "put out feelers" to people in Oregon, "looking at [Gilchrist] from the standpoint of a resort town * * * and also as — as housing for the mill employees." One contact, besides Ernst Brothers, expressed an interest in the property, but did not make a bid.

The fact that the market for a property is small and that few potential buyers were interested in the property does not necessarily diminish the role that a sale of that property may play in determining the property's value for assessment purposes. *Truitt Brothers, Inc. v. Dept. of Rev.*, 302 Or 603, 609, 732 P2d 497 (1987). The market for "company towns" is not large. The fact that the number of responses to the offer of the sale of the town was small is not evidence that the town was *improperly* marketed, so as to render the price actually paid an unusable indicator of value.

As part of this argument, the department contends that Gilchrist should have been marketed as either a retirement community property or a potential recreational development area. The president of Crown Pacific testified that Crown Pacific did use that marketing approach, but that there was little to no response. There is no evidence in the record that there was a market for buying company mill towns for the purpose of converting them to destination resorts or retirement communities. The department's argument is speculation, unsupported by the record.

The department also argues that Gilchrist was not on the market long enough. Ernst Brothers' appraiser testified that Gilchrist was on the market for 18 months. The department argues that the town was on the market for 9 months. In support of its argument, the department points to a list, made by U.S. National Bank, of potential buyers of the assets of Gilchrist Timber dated January 1, 1991. The list contains

names of potential buyers that were contacted or were to be contacted. The department argues that the date on the list should be considered the day that the property was first marketed. However, the evidence shows that marketing began before January 1, 1991, and that the list was prepared after marketing had begun; an obvious conclusion considering that the list indicates that over a hundred potential buyers had *already* been contacted by January 1, 1991. No other evidence was presented to controvert the testimony that Gilchrist was on the market for 18 months; 18 months is within the one- to five-year time period that the department's appraiser believed was necessary to market the property properly.

Finally, the department argues that the Tax Court erroneously viewed the sale to Ernst Brothers as a pre-assessment date sale, even though the sale was negotiated and closed after the assessment date. The department argues that, because the property was sold after the assessment date, the sale is not the best evidence of the property's value.

All the evidence indicated that the sale of Gilchrist closed in October 1991. The Tax Court, however, erroneously referred to the closing date as being October 4, *1990*. 12 OTR at 528. The Tax Court then stated that, "[o]n the whole, the sale of the subject property, some eight or nine months before the assessment date, is the best evidence of its value." *Id.* at 534.

In the absence of evidence showing a change in the underlying conditions affecting the value of a property between the assessment date and the sale date, a sale of property as a basis for assessing the value of that property is no less persuasive because that sale occurred within a reasonable time *after* the assessment date. *Sabin v. Dept. of Rev.*, 270 Or 422, 427, 528 P2d 69 (1974). No evidence of a change in market conditions between the assessment date and the sale date exists in the record. Accordingly, although the Tax Court erred, we agree with its conclusion that the sale of the subject property is the best evidence in this record of its real market value in 1991.

In summary, like the Tax Court, we are not persuaded by the department's valuation of Gilchrist. The

income approach offered by the department does not reflect all the relevant market conditions. The department's argument that the sale of Gilchrist was not an "arm's-length" transaction is not convincing. Accordingly, we reach the same result as did the Tax Court, which based valuation on the sale price of the property. The valuation, for assessment purposes, of the town of Gilchrist for the tax year 1991-92 is $500,000.

The judgment of the Tax Court is affirmed.