IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

MARK D. BYBEE                          )
and TRACILLE G. BYBEE,                 )
                                       )
            Plaintiffs,                )   TC-MD 120418N (Control)
                                       )            120585N
                                       )
      v.                               )
                                       )
MARION COUNTY ASSESSOR,                )
                                       )
            Defendant.                 )   **DECISION**

Plaintiffs filed their Complaint challenging the assessment of 52 unimproved lots (subject

properties) for the 2009-10 and 2010-11 tax years.[1]  (Ptfs' Exs AA, FF.)  In Orders issued

October 4, 2012, the court granted Defendant's motion to dismiss Plaintiffs' 2009-10 tax year

appeal, finding that Plaintiffs did not establish "good and sufficient cause" under ORS

305.288(3) for their failure to timely appeal the 2009-10 tax year.  A trial was held in the Tax

Court Mediation Center in Salem, Oregon, on January 8, 2013.  Plaintiff Mark D. Bybee (Bybee)

appeared and testified on behalf of Plaintiffs.  Robb Witters (Witters), Residential Appraiser,

appeared and testified on behalf of Defendant.  Plaintiffs' Exhibits labeled A through G and AA

through HH, attached to their Complaints, were received without objection.  Defendant's Exhibit

A was received without objection.

## I.  STATEMENT OF FACTS

The subject properties are located in the Fernwood Glen subdivision in Salem, Oregon.

(Def's Ex A at 1.)  The Fernwood Glen subdivision is located in south Salem, near the Creekside

Golf Course.  (*Id.*)  Both Bybee and Witters testified that the Fernwood Glen subdivision is in a

_____

[1] Plaintiffs filed two Complaints, TC-MD No 120418N and TC-MD No 120585N.  By Order of the court entered March 20, 2013, the court consolidated Plaintiffs' appeals.

desirable location.  Bybee testified that Plaintiffs purchased and developed 63 lots in the

Fernwood Glen subdivision in 2007 and 2008, including the subject properties.  (*See* Ptfs' Ex D.)

Eleven of those lots are not at issue in this appeal.  (Ptfs' Ex GG at 1.)  According to Plaintiffs'

Exhibits, the 11 lots not at issue in this appeal sold between November 14, 2008, and November

3, 2010.  (*Id.*)  Plaintiffs reported the sale prices of those lots as follows:

| Account | Sale Date | Sale Price |
| --- | --- | --- |
| R344758 | 11/14/08 | $100,000 |
| R344759 | 11/14/08 | $100,000 |
| R344756 | 11/25/08 | $115,010 |
| R344761 | 10/23/09 | $76,892 |
| R344748 | 11/16/09 | $95,000 |
| R344721 | 12/01/09 | $76,892 |
| R344750 | 12/15/09 | $73,474 |
| R344751 | 04/14/10 | $75,357 |
| R344757 | 05/25/10 | $80,925 |
| R344718 | 06/28/10 | $58,000 |
| R344746 | 11/03/10 | $63,000 |

(Ptfs' Exs D, GG at 1.)

Bybee testified that he sold the remaining 52 lots, the subject properties, in a bulk sale on

January 12, 2011, for $45,000 per lot.  (*See* Ptfs' Ex D.)  He testified that the sale was an arm's-

length transaction.  Bybee testified that $45,000 per lot was the best price that he could get at the

time, but he lost more than $900,000 on the subject properties.  He testified that the subject

properties were not selling quickly as of January 2011 and he was not in a position to "carry" the

subject properties for four or five years given the cost and risk involved.  Bybee testified that the

buyer of the subject properties was an experienced developer and builder who could afford to

"carry" the subject properties for a period of several years.  He testified that, immediately

following the January 12, 2011, sale, the buyer of the subject properties began selling the lots

individually for $60,000 to $63,000 per lot.  Witters questioned whether Bybee's sale of the

subject properties in January 2011 was the result of duress. Bybee testified that his sale of the subject properties was not influenced by duress.

Bybee testified that he considers his sale of the subject properties for $45,000 per lot in January 2011 to be the best evidence of the real market values of the subject properties as of January 1, 2010. He testified that he also considered other bare land sales in Marion County and found that prices supported his sale price of $45,000 per lot. (*See* Ptfs' Ex E.) Bybee identified 32 Salem land sales that occurred between 2004 and 2011, with unadjusted sale prices ranging from $12,600 to $45,000. (*Id.* at 1.) He did not make any adjustments to those sales. Witters noted that 12 of Bybee's comparable land sales were 2011 foreclosure sales of lots in the Bella Cresta subdivision in Salem, which sold for $25,000 to $30,000. (*See id.* at 2-13.) Bybee also presented evidence that Defendant reduced the real market values of two lots in the Fernwood Glen subdivision from $85,500 for the 2010-11 tax year to $55,000 for the 2011-12 tax year.[2] (Ptfs' Ex F.)

Witters testified that he did not consider Bybee's sale of the subject properties in January 2011 to be persuasive evidence of the real market values as of January 1, 2010, because the sale occurred more than one year after the assessment date and because it was a "bulk sale," which suggests that the price per lot was discounted. Bybee questioned Witters regarding his opinion of the amount of the "discount" associated with the sale of the subject properties. Witters was unsure of the precise amount, but testified that the real market value of lots in the Fernwood Glen subdivision was likely around $55,000 per lot as of January 1, 2011, as evidenced by the reduction in the real market values of the two lots that Bybee discussed in his testimony.

---

[2] The two lots are identified as Accounts R344758 and R344759. (*See* Ptfs' Ex F.) Bybee testified that he sold those lots to their current owner. Bybee's exhibits indicate that he sold those lots on November 14, 2008, for $100,000 per lot. (Ptfs' Exs D, GG.)

(*See* Ptfs' Ex F.) In response to Bybee's questions regarding a time adjustment, Witters testified that the prices of single family properties in Marion County decreased by about one percent per month between January 1, 2010, and January 1, 2011. He testified that prices of south Salem properties decreased even more during that time period. Bybee testified that, after adjusting for time and the bulk sale discount, his January 2011 sale of the subject properties indicated real market values of around $58,900 per lot as of January 1, 2010. Witters disagreed that the real market values of the subject properties were $58,900 per lot as of January 1, 2010.

Witters testified that many lots were offered for sale in south Salem around January 1, 2010; the competition made it very difficult to sell lots or make a profit. Witters testified that he identified nine comparable land sales located within two miles of the subject properties. (*See* Def's Ex A at 2.) The sales occurred between November 9, 2009, and March 25, 2010, with both unadjusted and adjusted sale prices ranging from $60,000 to $99,025. (*Id.*) The average adjusted sale price was $73,597 and the median adjusted sale price was $72,500. (*Id.*) Witters testified that he placed the most weight on two sales located in the Fernwood Glen subdivision: a sale for $87,208 on December 1, 2009, and a sale for $68,000 on December 15, 2009. (*Id.*) He made adjustments for market conditions and concluded a "weighted average" of $74,400 (rounded) for his comparable sales. (*Id.* at 2-3.) Bybee testified that Witters incorrectly reported the sale price of the December 1, 2009, sale. Bybee testified that he sold that property for $76,892 on December 1, 2009.[3] (*See* Ptfs' Ex D.)

Witters testified that, based on his comparable sales, he concluded real market values of $75,000 for 43 of the subject properties. (*See* Def's Ex A at 11.) He found that nine of the

___

[3] Witters determined a "weighted average" of $74,400 (rounded) for his comparable sales. (Def's Ex A at 2.) Adjusting the sale price of Witters' Sale 1, per Bybee's testimony, results in a corrected "weighted average" of $70,200 (rounded). (*See id.*)

subject properties have "recognized obsolescence" and applied a 25 percent "adjustment" to those lots, concluding real market values of $67,800 for each. (*Id.*) For the 43 subject properties without obsolescence, the 2010-11 real market values were $85,500 and the 2010-11 maximum assessed values were $64,220; Witters noted that those properties "will fall into compression if the market value[s] * * * fall[] under $67,800." (*Id.* at 10-11.) For the nine subject properties with "recognized obsolescence," the 2010-11 real market values were $64,130 and the 2010-11 maximum assessed values were $56,250; those properties "will fall into compression if the market value[s] * * * fall[] to less than $51,000." (*Id.*)

## II. ANALYSIS

The issue before the court is the real market values of the subject properties for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted)). Real market value is defined in ORS 308.205(1),[4] which states: "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *[.]" ORS 308.205(2). There are three approaches of value that must be considered, although all three may not be applicable in a given case. OAR 150-308.205-(A)(2)(a). The three approaches are: (1) the cost approach,

---

[4] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

(2) the sales comparison approach, and (3) the income approach. *Id.* Both parties presented evidence of comparable sales. "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions." OAR 150-308.205-(A)(2)(c). "The court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value[]" of the subject property. *Richardson*, WL 21263620 at *3.

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971) (citations omitted). Plaintiffs "must provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citations omitted). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (Mar 13, 2012). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Plaintiffs relied primarily on the January 2011 bulk sale of the subject properties. "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are

knowledgeable and willing, then the sale price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.* (*Kem*)*,* 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted). "In the absence of data indicating that 'the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Bros. Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994) (citations omitted).

Under *Kem*, a sale of the subject property must be "recent." 267 Or at 114. "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974). Plaintiffs sold the subject properties in January 2011. Bybee did not present any evidence on the market conditions in January 2010 as compared with January 2011. Witters testified that the prices of single family properties in Marion County decreased by about one percent per month between January 1, 2010, and January 1, 2011. He testified that prices of south Salem properties decreased even more during that time period. Witters testimony indicates that market conditions in January 2011, particularly in the south Salem residential market, were inferior to conditions in January 2010. Given the change in market conditions, the January 2011 sale of the subject properties cannot be considered "recent" as of January 1, 2010.

The January 2011 sale of the subject properties was also a bulk sale, at best reflecting the real market value of the 52 subject properties viewed as a single property. In *First Interstate Bank of Oregon, N.A. v. Dept. of Rev.* (*First Interstate*), 306 Or 450, 452, 760 P2d 880 (1988),

/ / /

/ / /

the Oregon Supreme Court considered whether "38 lots plus three tracts of land[]" in a subdivision should be assessed as separate units or, instead, as a "single property." In *First Interstate*,

> "Each of the lots was to be used for the construction of a single-family residence. The real estate boom collapsed, and by January 1, 1985, the relevant date for the valuation at issue, only six lots had been sold, and the plans for a condominium had been scrapped."

*Id.* Upon review of the applicable statutes, the Court held that "[t]he value of each lot by itself, not as a portion of a larger piece of property, must be assessed." *Id.* at 453 (citations omitted).

> The Court in *First Interstate* observed:
>
> "It is possible that in certain situations, the highest and best use of a lot would be a part of a group of lots. If that were the case, it would be appropriate to assess that lot based on its value as part of a group. That is not the situation in the present case."

306 Or at 453, n2. In considering the proposed "developer's discount" method of valuing "multiple lots in a subdivision with a single owner[,]" the Court noted that "the value to the owner cannot be equated with the market value." *Id.* at 454. Valuation of the subdivision lots as an investment was inconsistent with the highest and best use of the lots:

> "The developer's discount does not assess the value of the properties if put to their highest and best use, but reduces their value to arrive at the value of the properties considered as an investment. Investment is not the highest and best use of the properties."

*Id.* at 454-55. Similarly, in *Ward v. Dept. of Rev.*, the Court observed: "In real estate, the value of the whole is relevant to the value of a part, but it is not necessarily determinative. The market value of a large parcel does not necessarily equal the sum of the market value of the parts into which that parcel may be divided or subdivided because smaller parcels may be more readily marketable." 293 Or 506, 510, 650 P2d 923 (1982).

/ / /

Plaintiffs in this case assert that the 2010-11 real market values of the subject properties should be reduced based on the January 2011 bulk sale of the subject properties. As in *First Interstate*, the January 2011 bulk sale price of the subject properties does not reflect the real market value of each lot individually; rather, it reflects the value of the lots as a single property held for investment. The subject properties were single family residential lots as of January 1, 2010. Plaintiffs did not offer any evidence that the highest and best use of the subject properties was as a part of a group of lots held for investment rather than as single family residential lots. Even if appropriate time adjustments were applied, Plaintiffs' sale of the subject properties in January 2011 does not represent the highest and best use of the subject properties. That is supported by Bybee's testimony that the buyer of the subject properties began selling the lots individually for $15,000 to $18,000 more per lot immediately following the January 2011 sale.

Witters relied upon the sales comparison approach and concluded real market values of $75,000 for 43 of the subject properties without obsolescence and $67,800 for nine of the subject properties with "recognized obsolescence." Witters' conclusions are supported by other sales in the Fernwood Glen subdivision that occurred close to the January 1, 2010, assessment date. Bybee presented evidence of 11 lots in the Fernwood Glen subdivision that sold between November 14, 2008, and November 3, 2010. Four of those lots sold between November 2009 and April 2010 with prices ranging from $73,474 to $95,000. Bybee testified that Witters incorrectly reported one of his comparable sales as $87,208 when, in fact, that property sold for $76,892 on December 1, 2009. Correcting that error results in a revised weighted average of $70,200 (rounded) for Witters' comparable sales without "recognized obsolescence."

/ / /

Overall, the evidence presented supports the 2010-11 real market values determined by Witters. Even correcting the error in Witters' comparable sales approach, there is no evidence supporting 2010-11 real market values of less than $70,200 per lot for the subject properties without "demonstrated obsolescence." Although the evidence supports 2010-11 real market values that are less than the 2010-11 roll real market values, the court cannot order a change to the tax roll because Plaintiffs are not aggrieved under ORS 305.275(1)(a). Witters provided evidence demonstrating that, for the 2010-11 tax year, Plaintiffs will not receive any property tax savings unless the real market values of the 43 subject properties without obsolescence is reduced to $67,800 or less and the real market values of the nine subject properties with obsolescence is reduced to $51,000 or less. The evidence does not support such reductions.

III. CONCLUSION

After careful consideration, the court concludes that the January 2011 bulk sale of the subject properties is not persuasive evidence of the real market values of each of the subject properties for the 2010-11 tax year. The court further concludes that, although the evidence presented supports real market values less than the roll real market values for each of the subject properties, the court cannot order a change to those real market values because Plaintiffs are not aggrieved under ORS 305.275(1)(a). Plaintiffs' appeal must be denied. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that, as set forth in the court's October 4, 2012,

Orders, Plaintiffs' appeal for the 2009-10 tax year is dismissed.

IT IS FURTHER DECIDED that Plaintiffs' appeal for the 2010-11 tax year is denied.

Dated this ____ day of March 2013.


_____
ALLISON R. BOOMER
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on March 20, 2013. The court filed and entered this Decision on March 20, 2013.*