IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| STEVE PROCK | ) | |
| and KITTIE PROCK, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 160197R |
| | ) | |
| v. | ) | |
| | ) | |
| CLATSOP COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiffs appeal a Board of Property Tax Appeals (BOPTA) Order, dated March 16, 2016, finding that the real market value of property identified as Account 32504 ("the Property") for the 2015-16 tax year, was $405,240. Plaintiffs allege that the Property had a real market value of $330,000 for the 2015-16 tax year. A trial was held in the courtroom of the Oregon Tax Court on August 17, 2016, in Salem, Oregon. Steve Prock (Prock) appeared and testified on behalf of Plaintiffs. Christopher Leader (Leader) appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 10 were received without objection. Defendant's Exhibits A and B were received without objection.

## I. STATEMENT OF FACTS

The Property is a 3,377-square foot house built in 1997 located on a 0.55 acre lot with frontage on Long Lake, in Warrenton, Oregon. (Def's Ex A at 3.) The Property includes three bedrooms, two half bathrooms, and two full bathrooms. (*Id*. at 9.) It also includes a two-car garage, three fireplaces, two decks and windows that face the lake. (*Id*. at 9, 11.)

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered January 18, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

Prock testified that he found the Property in May 2015, after seeing a realtor's "for sale" sign. At the time the Property was listed for $365,000. Prock viewed the Property twice and noted that although it had been built with high end amenities there was substantial deferred maintenance. Prock considered the Property to be a "total mess" because some of the plumbing did not work properly, there were cracks in the kitchen tile and the flooring, the deck was rotting, and the stairs leading to the lake appeared to be moving towards the water. He offered $330,000, which was accepted, and the sale closed on June 22, 2015. (Ptfs' Ex 4; Def's Ex A at 13.)

Prock testified that he did not know the seller or the real estate agent prior to making an offer for the Property. He considered the sale an "arms-length" transaction and conclusive evidence of the Property's market value. Prock testified that sales in the area support his value of the Property. As an example, Prock testified the house next door to the Property which is larger and in better condition, built in 2006, and on the market for several years, sold in October 2013 for $315,000. (*See also* Ptfs' Ex 6; Def's Ex A at 7 (sale #12).) Prock presented the property tax statements for several properties in the vicinity of the Property with handwritten statements indicting the sale date and price as evidence of value for the properties. (*See* Ptfs' Ex 6 - 9.) Prock testified that he had many other comparable sales but "did not bring them" to court.

Prock presented a letter from the Property's listing real estate agent ("realtor") opining that the value of the Property was about $350,000 "for property tax purposes." (Ptfs' Ex 1) The realtor originally listed the Property in October 2014 for $394,000. (Ptfs' Ex 5 at 2.) Between April 24, 2015, and May 16, 2015 the Property price was changed to $425,000. (Def Ex A at 5.) The Property was re-listed on May 16, 2015 for $365,000. (Ptfs' Ex 5 at 3.) The realtor cited the price per square foot of two recent sales near the property and a similar calculation for a property with a pending sale. (Ptfs' Ex 1.) She valued the Property at $99 per sq. foot for the

living space in consideration of its below average condition. (*Id*.) She also wrote that Plaintiffs tendered the only offer for the property during her listing period. (*Id*.)

Prock testified that a number of issues with the Property negatively affected its value. He testified that the lake is shallow, filled with debris and plants, and is not usable for boating. The path from the house to the lake appears to be sinking and the steep hillside is filled with blackberries and brush. He noted that there is no yard on the Property and noise is audible from the nearby road. Prock testified that after purchasing the Property he replaced the refrigerator, washer-dryer, and furniture. He cleaned other areas but did not repair them. In the winter, part of the roof was blown-off in a storm and he subsequently repaired the roof. Prock has been offering the Property as a vacation rental with rates from $275 to $375 per night. (Def's Ex B at 1.) Prock criticized Defendant's appraisal stating that it over-emphasized the value of it being a lake-front Property; that Defendant selected properties for comparison that were in much better shape and/or adjacent to better lakes; and that Defendant discounted his 2015 purchase of the Property and that of the neighboring house as "distressed" sales.

Leader testified that he a senior appraiser and data analyst for the Clatsop County Assessor's office. He prepared an appraisal report of the Property with an effective date of January 1, 2015. (Def's Ex A.) The report acknowledged that the Property was sold on June 22, 2015, for $330,000, but indicated that "one sale does not make [a] market." (*Id*. at 4.) The appraisal considered the cost approach, the market approach, and the income approach for valuing the Property. Leader determined the income approach was not appropriate because the Property was a single-family dwelling. Lender considered the cost approach to value based on the Oregon Department of Revenue's 2005 Residential Costs Factor Book. Leader found that using the cost approach, the replacement cost for the Property was $434,155, without adjustment.

He deducted 10.25 percent depreciation and added the land value of $56,000 to arrive at a value of $445,655. Leader testified that he did not emphasize the cost approach as the best indicator of value for the Property.

Leader found that the real market value of the Property using the market approach was $405,240. Leader considered the sales of 13 properties, but primarily relied on the sales of five properties located within several miles of the Property with lake frontage. (Def's Ex A at 7.) The relevant properties are summarized as follows:[2]

| Property | Sale Date | Year built | Class | SF | Sales Price | Adj. sales price | Sale/SF |
|----------|-----------|------------|-------|-------|-------------|------------------|---------|
| **Subject** | 6/22/15 | 1997 | 5 | 3,377 | $330,000 | no adj. | 98 |
| **#1** | 5/14/15 | 2004 | 5 | 2,641 | $405,000 | $390,420 | 148 |
| **#2** | 10/9/15 | 2005 | 5 | 2,438 | $400,000 | $367,600 | 151 |
| **#3** | 8/08/14 | 1995 | 6- | 3,487 | $515,000 | $521,438 | 150 |
| **#4** | 4/13/15 | 2003 | 4 | 2,672 | $329,000 | $314,522 | 118 |
| **#5** | 9/30/15 | 1987 | 4+ | 3,344 | $355,000 | $326,245 | 98 |

Leader testified that adjustments were made based on a hypothetical sale date of January 1, 2015. Property values were increased for 2014 at 0.25 percent per month and decreased 0.90 percent for 2015 based on county market trends. He testified that sales #1 through #4 have a price per square foot of between $118 to $151, and he used bracketing to find the higher end and lower end of recent sales. Based on those sales Leader found the Property should be valued at $120 per square foot resulting in a real market value of $405,240.

Leader testified that he did not believe the June 2015 sale of the Property to be indicative of its real market value because he considered it a distressed sale. He testified that the seller of the Property was a well-known local college president who had accepted a new job out of state around the time the sales price was reduced from $425,000 down to $365,000. Leader presented a table from Defendant's 2016 Ratio Study (Study), which indicates "typical list to sale price

---

[2] The information from this table is taken from Def's Ex A at 7.

ratios for residential properties in 2015 [in the county] were 95% to 100% of [the] last list price with a substantial amount of transactions realizing a final sale price above the last list price." (Def's Ex A at 5.) The Study used 579 "good sales with listing history" and found 73 percent of the sales were at 95 percent or higher of the last listing prices. *Id*. Leader testified that the sales price of $330,000 was only 90 percent list to sale price ratio. He opined that the potential motivation of the seller, who was moving out of state, together with a sales price out of line with Defendant's Study show that the sale of the Property should be viewed as a distressed sale. Leader also discounted a recent sale of the house next door to the Property—that property was on the market for years and was eventually sold as an estate sale.

Leader testified that Plaintiffs' pictures of the property (Ptfs' Ex 10) were zoomed-in isolated shots designed to make the Property's defects look larger than they really were. He cited to the fact that Plaintiffs made only cosmetic changes before posting attractive pictures of the Property offering rental rates from $275 to $375 per night.

## II. ANALYSIS

The issue before the court is the real market value of the Property for the 2015-16 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *2 (Or Tax M Div Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1),[3] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

/ / /

---

[3] The court's references to the Oregon Revised Statutes are to 2013.

The assessment date for the 2015-16 tax year is January 1, 2015. ORS 308.007; ORS 308.210. The real market value of Property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id*. Here, both parties relied on the sales comparison approach, although Defendant also considered the cost and income approaches.

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor*, TC-MD 060354D, WL 1068455 at *3 (Or Tax M Div Apr 3, 2007) (citations omitted). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the Property. *Richardson*, WL 21263620 at *3.

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition."

OAR 150-308-0240(2)(c).

Plaintiffs bear the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16

OTR 56, 59 (2002). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.    *Plaintiffs' Evidence*

Plaintiff primarily relies upon his June 2015 purchase price of $330,000 as conclusive evidence of the real market value of the Property.

> "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value."

*Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted). "In the absence of data indicating that 'the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Brothers Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994) (citations omitted).

Plaintiffs' case depends entirely on the 2015 sale of the Property because they did not present other persuasive evidence of the real market value of the Property. Plaintiffs' letter from the realtor is unpersuasive because it does not include sufficient foundational market transactions with the type of detail necessary to follow her conclusion of value. With regard to the other property sales cited by Plaintiffs, a sales figure alone, without any information about the properties and without adjustments cannot provide a basis for the court to use in its determination of real market value.

/ / /

Under *Kem*, a sale of the subject property must be "recent." 267 Or at 114. Plaintiffs purchased the subject Property in June 2015, which is "recent" with respect to the January 1, 2015, assessment date. The sale must also be a "voluntary, arm's length transaction." *Id*. Here, the voluntary nature of the sale is not disputed; however, Defendant asserts that the sale represented a distressed sale because the listing price was significantly reduced before sale and after the seller had accepted a job in another state. Leader argues that the price reduction, in conjunction with the seller's relocation, with the analysis that "the accepted sale price of $330,000 from the last list price of $365,000 equates to a 90% list to sale price ratio ($330,000/ $365,000) * * * suggests an atypically motivated seller." (Def's Ex A at 5.)

In analyzing whether sale of the Property represented a distressed sale, the court will break the issues into two parts: the motivation of the seller and the sales prices as an aberration from the market trends. With regard to the motivation of the seller, the parties do not dispute that the seller of the Property dropped the list price contemporaneously with his relocation out of state. That fact provides some evidence that the seller may have been motivated. But that fact alone does not persuade the court that sale of the Property was the result of an atypically motivated seller. Surely it is not atypical for a property owner to list or sell property because they are relocating. It is also not atypical for a seller to reduce the list price when they do not receive any offers. Here the Property had been listed for over a year at various price points without a single offer. The court notes that the list price was lower than Defendant's appraised price for a year without a single offer. This suggests that it is just as likely that the price point had been too high. The fact that there was a $31,000 increase in list price one month before lowering the price appears to be an anomaly or sales gimmick. The broad theory proposed by Defendant would call a large number of sales "distressed" merely because the seller was

relocating and/or had lowered the list price. The move and change in sales price alone are not persuasive that the seller was atypically motivated.

Next, Defendant asserts that its Study demonstrates that the sales price was out of line with County trends. Defendant's Study analyzed 579 sales and found 73 percent had sales prices at or above 95 percent of the last list price. Defendant argues that the Property sold for 90 percent of the last list price which is evidence of an atypically motivated seller. The court views the Study as some evidence indicating an atypical sale; but not very persuasive evidence that the sale was atypical. The ratio could well be explained by other factors, such as the poor condition of the property or the result of overly aggressive pricing. The court is persuaded by Plaintiffs' evidence that the sale of the Property was a recent arms-length transaction.

B.      *Defendant's Evidence*

Leader presented evidence under the sales comparison approach listing 13 sales in the area of the Property, with sales 1 through 4 being considered as the most comparable, and sales 7 through 12 offered as potential rebuttal evidence, even though they were not deemed comparable. The analysis relied on a straight computation of the price per square foot of the comparable properties, adjusted only for the date of sale. The appraisal did not include adjustments for condition, age, square footage, or number of bed and bathrooms for the properties. Prock testified, for example, that sale #3 on Defendant's appraisal is not comparable at all based on pictures of the property. Based on the pictures, the court is inclined to agree that the property appears far larger and superior in every way. However, without any data about the number of bed and bathrooms, or the total area of the lot, the court is unable to evaluate the effect of this sale on the real market value of the Property. The same is true of the remaining

/ / /

comparable sales presented by Defendant. The court also does not accept Defendant's cost approach analysis as a reliable indicator of real market value in light of the Property's age.

Plaintiffs may well have purchased the Property at a bargain price. However, that sale was the only reliable evidence presented as to the real market value of the Property. The court finds Plaintiffs' evidence more persuasive.

## III. CONCLUSION

After carefully considering the testimony and documentary evidence presented, the court finds that the Property's real market value was $330,000 for the 2015-16 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted. Defendant shall correct the 2015-16 tax roll value of the property identified as Account 32504 to reflect a real market value of $330,000.

Dated this ___ day of February 2017.

_____
RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on February 6, 2017.*