IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PAUL H. FRANCIS )
and JENNIFER JOHNSON FRANCIS, )
)
Plaintiffs, ) TC-MD 120407N
)
v. )
)
DESCHUTES COUNTY ASSESSOR, )
)
Defendant. ) **DECISION**

Plaintiffs appeal the real market value of property identified as Account 242446 (subject property) for the 2011-12 tax year. Trial in this matter was held in the Oregon Tax Court Mediation Center on February 19, 2013. Jennifer Johnson Francis (Johnson) and Paul H. Francis (Francis) each appeared and testified on behalf of Plaintiffs. John Stone (Stone), Oregon licensed real estate broker, testified by telephone on behalf of Plaintiffs. John Laherty, Assistant Legal Counsel to Deschutes County, appeared on behalf Defendant. Todd Straughan (Straughan), Residential Appraiser, Deschutes County Assessor, testified on behalf of Defendant. Plaintiffs Exhibits 2 through 7 and 9 were received without objection.[1] Plaintiffs' Exhibit 8 (a listing) was received over Defendant's objection. Defendant's Exhibits A and B were received without objection. Defendant's Rebuttal Exhibit (a listing) was received over Plaintiffs' objection.

## I. STATEMENT OF FACTS

The subject property is lot 196 located within the Estates of Pronghorn subdivision

---

[1] Plaintiffs' Exhibit 1 is an appraisal report prepared by Arthur E. Gimmy (Gimmy), MAI, AGI Valuations. Gimmy was not available to testify at trial. Plaintiffs offered Exhibit 1 for the limited purpose of establishing the golf course membership monthly dues at Pronghorn. The court excluded Plaintiffs' Exhibit 1 because the author of the report, Gimmy, did not testify at trial. Francis testified regarding the membership monthly dues.

(Pronghorn). (Ptfs' Compl at 1; Def's Ex A at 1.) Pronghorn is a 640-acre destination resort located fifteen minutes from Bend, Oregon, that is platted with vacant lots, ranging in size from 0.43 to 2.76 acres. (Def's Ex A at 2, 7; Ptfs' Ex 2 at 11.) It is an "exclusive resort with minimal to no access to the general public." (*Id*. at 2.) "Pronghorn has two preeminent golf courses one designed by Tom Fazio and the other by Jack Nicklaus. * * * These two courses have received recognition in numerous golf magazines as some of the top courses to play in the nation." (*Id*. at 3.) Lots located around the Fazio golf course are generally regarded as more desirable than lots located around the Nicklaus golf course. (Ptfs' Ex 9 at 1.) Pronghorn also includes a 54,000 square-foot clubhouse, another facility with a bar and restaurant, a pool, and a tennis facility. (Def's Ex A at 3.) "One of the requirements of ownership at Pronghorn is that the owners become a paying member of 'The Club[.]' " (Ptfs' Ex 2 at 8.) Membership requires a $115,000 initiation fee and monthly membership dues. (*Id.*)

Johnson testified that the subject property is a small lot and lacks golf course or mountain views. She testified that there is a rock outcropping on the subject property that cannot be removed. (*See* Ptfs' Ex 5 at 2.) Francis testified that Plaintiffs purchased the subject property for $249,000 in April 2010. He testified that, with their purchase, Plaintiffs received a reduction in their membership dues from $990 per month to $390 per month for a period of 36 months, reflecting a total savings of $21,600. Francis testified that, additionally, Plaintiffs' guest fees for the golf course were waived for three years. He testified that guest fees are about $150 per round. Francis testified that Plaintiffs subjectively valued the guest fee waiver at $1,000 per year. He testified that he would not have purchased the subject property without those concessions. Francis testified that Plaintiffs' net purchase price of the subject property was $109,400 after subtracting the membership dues ($115,000), monthly dues discount ($21,600),

and guest fees waiver ($3,000).

Straughan questioned whether Plaintiffs, in fact, received concessions with their purchase of the subject property. Straughan testified that Scott Walley (Walley), Vice President, Finance, Pronghorn, provided him with a spreadsheet summarizing Pronghorn sales, including the subject property sale. (*See* Ptfs' Ex 3 at 52.) Straughan testified that he discussed the sales with Walley, who indicated whether each sale included any benefits other than the real estate. (*See id.* at 40-41, 52.) Straughan testified that Walley did not report any additional benefits or concessions for the subject property sale and Walley "assume[d] a net price of $134k." (*See id.*) Straughan provided a letter from Richard Korowicki (Korowicki), a broker who previously worked at Pronghorn and was involved in the sale of the subject property, and noted that Korowicki did not report any concessions. (*See* Def's Ex A at 15.) In response to Defendant's question, Francis acknowledged that neither the subject property closing statement nor the sale agreement include a reference to concessions. (*See* Def's Exs B, A at 13-14.)

A.    *Real market value of subject property*

The parties both relied upon comparable sales located within Pronghorn to determine the 2011-12 real market value of the subject property. The parties agree that, "[d]ue to Pronghorn's exclusivity, it is necessary to only use sales data from within the resort when valuing property within Pronghorn[]" as opposed to sales in other resort communities. (*See* Ptfs' Ex 2 at 12; Def's Ex A at 8.)

1.    *Plaintiffs' evidence*

Plaintiffs request that the 2011-12 real market value of the subject property be reduced in accordance with Stone's opinion of value. Stone testified that he has listed and sold many properties in Pronghorn and he is very familiar with the lots. He testified that he had a broker

office at Pronghorn from January 2009 through April 2010, and he continued to sell Pronghorn lots as of the date of trial. Stone testified that concessions were typical as of January 1, 2011, including reductions in membership dues and reductions in guest fees. He testified that concessions given were generally not recorded in sales documents due to the preferences of the Pronghorn principal broker and the Pronghorn developer.

Stone stated that "[t]here has always been a hierarchy in value in the minds of sales staff and qualified buyers for lots that are on the Fazio golf course * * *. The values are based upon location, privacy, lot size and views with views being the dominant factor in determining a lot's value." (Ptfs' Ex 9 at 1.) Stone wrote that "Pronghorn lots 196, 250 and 279 are all generally known as Pronghorn Estate Lots in the Fazio section." (*Id.*) He testified that lot 196, the subject property, is a smaller lot (about half an acre) and it lacks mountain views. (*See* Ptfs' Ex 5.) Stone described the superior views and amenities of lots 250 and 279, concluding that, in his view, "[l]ot 279 has the highest value, lot 250 is the second in value and lot 196 is the least in value."[2] (Ptfs' Ex 9 at 1.) Stone initially determined that "the fair market value of lot 196 on January 1, 2011 was $14,781[,]" but he revised his opinion at trial to a real market value in the range of $15,000 to $25,000. (*Id.* at 2.) Stone testified that he considered the 2011 sales of lots 142, 270, 271, and 273, and he based his value opinion on sale prices, size, views, and privacy.

In addition to Stone's opinion of value, Plaintiffs presented evidence of other Pronghorn sales in 2010 and 2011. Johnson testified that she created a spreadsheet based on lot sale prices and county assessment information obtained through "DIAL," an online property database maintained by Defendant. (*See* Ptfs' Ex 4 at 4.) The spreadsheet provides information about eight lots, including the subject property. (*Id.*) Johnson testified that the lots sold between April

---

[2] It is unclear why Stone discussed lots 250 and 279 at length given that he did not rely on those lot sales for his opinion of the subject property real market value.

2010 and June 2011. The sale prices range from "-$30,000"[3] for lot 142 to "310,000" for lot 278. (*Id.*) Johnson testified that she plotted those sales on a graph to demonstrate the downward trend from April 2010 to June 2011. (*See id.* at 3.) Plaintiffs also provided a February 6, 2013, listing of lot 199 for $115,000. (Ptfs' Ex 8.) Francis testified that lot 199 is located a few lots away from the subject property. He testified that the listing price indicates that the lot is, effectively, worth nothing to the seller because $115,000 is the Pronghorn membership fee.

2. *Defendant's evidence*

Straughan testified that he is a residential appraiser for Defendant and is very familiar with the Pronghorn properties. He testified that he used the sales comparison approach to determine the real market value of the subject property. Straughan testified that he selected four Pronghorn lot sales that occurred between April 2010 and March 2011, including the subject property.[4] (*See* Def's Ex A at 8.) He subtracted the $115,000 membership fee from each of the sales for the following adjusted prices: $134,000 for lot 196 (subject property) in April 2010, $310,000 for lot 278 in May 2010, $129,900 for lot 250 in June 2010, and $87,000 for lot 279 in March 2011. (*Id.*) Straughan testified that lot 278 is located next to lot 279, is the same size at lot 279, and has the same views as lot 279. (*See* Ptfs' Ex 5 at 6.)

Straughan gave minimal weight to the sales of lots 278 and 279 because they "could be considered anomalies * * *." (Def's Ex A at 9.) Excluding those two lot sales, the average price of the two remaining lot sales was $132,000, rounded. (*Id.*) Straughan reported that the mass appraisal value for the Fazio lots was $115,000, rounded. (*Id.*) He observed that the subject property's 2011-12 roll real market value of $115,000 "compared to its sales price indicates a

---

[3] Plaintiffs' sale prices are adjusted to remove the $115,000 membership fee. The sales that Plaintiffs reported as negative prices sold for less than $115,000, or at a loss in Plaintiffs' view.

[4] Straughan testified that all of his comparable sales were bank-owned. He testified that he was unable to find any comparable sales that were not bank-owned.

reduction from the purchase price of $19,000 or 1.5% per month[]" and that "decrease is supported by the [] multiple listing 'YTD Statistics thru December of' page." (*Id.*) Based on that information, Straughan concluded that the real market value of $115,000 was supported. (*Id.*)

Plaintiffs inquired why Straughan did not include in his sales comparison approach lots 273 or 112, which sold for adjusted prices of $45,000 in June 2011 and $55,000 in September 2010, respectively. (Ptfs' Ex 3 at 40.) Straughan testified that those lots are located on the Nicklaus side of Pronghorn, so he did not think that they were comparable. Plaintiffs also questioned why Straughan did not consider the sale of Lot 142, which Walley reported "sold at a loss" in June 2011 and which "included a [] partially built house (foundation and some walls)." (*Id.* at 41.) Straughan testified that he disagreed Lot 142 was sold at a loss.

Plaintiffs also questioned why Straughan did not make adjustments for time, lot size, location, view, and other differences. Referring to the tax roll real market values assigned by Defendant, Johnson testified that, for the 2010-11 tax year, Defendant used lot size and other characteristics to differentiate the real market values of Pronghorn lots. (*See* Ptfs' Ex 4 at 4; *see also* Ptfs' Ex 2 at 11.[5]) Johnson testified that, as of the 2012-13 tax year, Defendant assigned the same real market value ($20,000) to all Pronghorn lots. (*See* Ptfs' Ex 4 at 4.) Johnson testified

/ / /

---

[5] Plaintiffs provided a copy of Defendant's appraisal prepared for a 2010-11 tax year appeal of Pronghorn lots. (Ptfs' Ex 2.) Johnson drew the court's attention to the following excerpt from Defendant's appraisal:

"By 1/1/10, Pronghorn had been experiencing a significant declining market for several years. The Assessor's office, through collaboration with Pronghorn staff, estimated that the market had declined in the Pronghorn resort approximately 4% per month from 1/1/2008 to 1/1/2009. The Assessor's office collaborated with Pronghorn to estimate a 2% per month downward trend year over year between 1/1/2009 and 1/1/2010. In reality, Pronghorn did not demonstrate a consistent rate of decline over the several years immediately preceding the January 1, 2010 assessment date."

(*Id.* at 11.)

and provided additional exhibits regarding Defendant's various assessments of the Pronghorn lots between 2008-09 and 2012-13. (*See* Ptfs' Ex 4 at 5.)

Straughan testified that the number of sales in Pronghorn has dwindled each year since 2008. He testified that it has become less clear whether site size, location, views, or other amenities are affecting sale prices. Straughan testified that, as of 2011, he could not extract market-based adjustments from the available sales data. He testified that the limited and erratic market data also made it difficult to determine time trends. (*See* Def's Ex A at 9.) Straughan stated in his report that the "general trend" for "Residential Land/Lots Bend" was a decrease of 1 percent per month and, if that trend were applied to the subject property sale price of $134,000, it would indicate a value of $121,940 as of January 1, 2011.[6] (*Id.* at 9, 12.)

B.     *2011-12 roll real market value and the parties' requested values*

The 2011-12 roll real market value of the subject property was $115,000 and that value was sustained by the Deschutes County Board of Property Tax Appeals. (Ptfs' Compl at 2.) Plaintiffs verbally amended their Complaint at trial to request a 2011-12 real market value in the range of $15,000 to $25,000, as determined by Stone. Defendant requests that the 2011-12 roll real market value of $115,000 be sustained.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2011-12 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

---

[6] Straughan explained his calculation as follows: "1% x 9 months = 9%, 134,000 x 91% = $121,940." (Def's Ex A at 9.)

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[7]

The assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.* The value of property is ultimately a question of fact. *Chart Dev. Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citations omitted).

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971) (citations omitted). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (citations omitted). "Competent evidence includes * * * testimony from licensed professionals such as appraisers, real estate agents[,] and licensed brokers." *Hausler v. Multnomah County Assessor*, TC-MD No 110509D, WL 5560673 at *4 (Nov 15, 2011). "[T]he court has jurisdiction to determine the real market value or correct

---

[7] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Both parties relied upon comparable sales of Pronghorn lots to support their requested real market values. (*See* Def's Ex A at 8 (stating "[d]ue to Pronghorn's exclusivity, it is necessary to only use sales data from within the resort when valuing property within Pronghorn").) The sales comparison approach is preferred where there is a significant ascertainable market for similar properties. *Ward v. Dept. of Rev.*, 293 Or 506, 511, 650 P2d 923 (1982) (citations omitted). In considering the sales comparison approach, the court looks at arm's-length sales transactions of similar property to determine a correct real market value. *Richardson*, TC-MD No 020869D at 5.

Plaintiffs rely, primarily, on Stone's opinion of value. Stone testified that he determined a real market value range of $15,000 to $25,000 for the subject property. He testified that he considered the sales of lots 142, 270, 271, and 273 and adjusted for differences in size, view, privacy, and other amenities. Unfortunately, Stone presented a conclusion without explaining his analysis or the evidence that he relied upon. He did not provide any information regarding the four lots that he considered, nor did he identify the adjustments that he made or how he determined a real market value range of $15,000 to $25,000. The court does not question Stone's expertise, but the court cannot give any weight to his opinion of value because it was not adequately supported through Stone's testimony or exhibits.

Plaintiffs offered additional evidence of Pronghorn sales in 2010 and 2011. Plaintiffs did not make adjustments to those sales, but rather plotted them on a graph to show a downward trend from April 2010 to June 2011. Straughan agreed that land prices in Bend were decreasing in 2010, but disagreed that there were sufficient sales in Pronghorn from which to determine a

time trend. He stated that, "due to the limited amount of data within Pronghorn, a reconcilable time trend could not be supported. Therefore, it was considered best to compare all of the sales as a whole, regardless of sale date." (Def's Ex A at 9.)

Plaintiffs' remaining evidence focused on Defendant's assessments of Pronghorn lots in prior tax years, 2008-09 and 2010-11. Plaintiffs argued that Defendant's valuation methodology for the Pronghorn lots has changed from year to year and is not governed by a rational process. Plaintiffs take issue with Defendant's change in position regarding whether lot sizes, views, location, privacy, and other amenities should be considered in determining real market value. To the extent that Plaintiffs' criticism of Defendant's valuation methodology pertains to prior tax years not before the court, that criticism and evidence is not relevant here. With respect to the 2011-12 tax year, Straughan testified that he could not determine market-based adjustments from the Pronghorn sales that occurred in 2010 and 2011.[8] Neither Plaintiffs nor their expert witness, Stone, offered any evidence of market-based adjustments other than a time adjustment.[9] The court accepts Straughan's testimony that he could not determine market-based adjustments for differences such as lot size, view, privacy, location, or other amenities. However, the court is not persuaded that the evidence is insufficient to make a time adjustment.

The court finds that Plaintiffs have failed to meet the burden of proof with respect to their requested reduction in the real market value of the subject property for the 2011-12 tax year. Even though the burden has not shifted under ORS 305.427, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

---

[8] However, Straughan testified that he did not consider the Fazio and Nicklaus lots to be comparable.

[9] As discussed above, Stone testified that he made adjustments to sales in reaching his real market value conclusion for the subject property. However, he did not identify or explain those adjustments.

"A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sale price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.,* 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted). "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974). "In the absence of data indicating that 'the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Bros. Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994) (citation omitted).

Plaintiffs purchased the subject property in April 2010 for $249,000. The parties agree that Plaintiffs' purchase price should be adjusted downward to reflect the $115,000 membership fee included in the price. Plaintiffs contend that the purchase price should be further adjusted to reflect the concessions that Plaintiffs received as an inducement to purchase the subject property. Defendant disagrees with any further adjustment because there is no written record or evidence of those concessions and the concessions were not reported to Defendant. Plaintiffs testified that they received a reduction in the membership dues from $990 per month to $390 per month for a period of 36 months, reflecting total savings of $21,600. Francis testified that, additionally, Plaintiffs' golf course guest fees were waived for three years. Plaintiffs subjectively valued the guest fee waiver at $1,000 per year.

/ / /

It is unfortunate that the concessions described by Plaintiffs were not recorded or otherwise documented in a written agreement.[10] The court found Plaintiffs to be credible and does not doubt their testimony regarding their membership dues and guest fees. However, the absence of any additional, written evidence raises many questions. For instance, Stone testified that, although concessions were typical as of January 1, 2011, they were generally not recorded due to the preferences of the Pronghorn principal broker and the Pronghorn developer. The lack of available information regarding concessions makes it difficult to ascertain the market, as of January 1, 2011, for golf course memberships as distinct from lots.[11] Furthermore, the court is not persuaded by Plaintiffs' proposed methodology of subtracting the value of the discount that they received on their monthly membership dues and guest fees from their purchase price for the subject property.

The court finds that Plaintiffs' April 2010 purchase of the subject property provides the best evidence of its 2011-12 real market value. The court concludes that, as determined by Straughan, Plaintiffs' April 2010 purchase price for the subject property should be adjusted to remove the $115,000 membership fee. The court is persuaded that prices of Pronghorn lots were decreasing between April 2010 and January 2011. Straughan stated in his report that the "general trend" for "Residential Land/Lots Bend" was a decrease of 1 percent per month and, if that trend were applied to the subject property sale price of $134,000, it would indicate a value of $121,940 as of January 1, 2011. The 2011-12 roll real market value of the subject property was

---

[10] By contrast, in *Tetherow Golf Course LLC v. Deschutes County Assessor and Dept. of Rev.*, TC No 4988 at 3 (Jul 31, 2013), involving the valuation of both a golf course and adjacent residential lots, the court found that "[i]n addition to membership fees, members are required to pay monthly dues. This membership obligation is a covenant recorded in the land records and binding on persons who purchase residential lots."

[11] In its 2010-11 tax year appraisal of Pronghorn lots, Defendant wrote: "Historically, Pronghorn has included different intangible items within the recorded sales prices. This has made it difficult to discern the actual amount paid by each buyer for the real estate or tangible property." (Ptfs' Ex 2 at 9.)

$115,000. Thus, Plaintiffs' purchase price, adjusted for the membership fee and for changes in market conditions between April 2010 and January 2011, supports the 2011-12 roll real market value.

### III. CONCLUSION

After careful consideration, the court finds that Plaintiffs failed to prove by a preponderance of the evidence that the 2011-12 real market value of the subject property was in the range of $15,000 to $25,000. The court further finds that the 2011-12 roll real market value of the subject property, $115,000, is supported by Plaintiffs' April 2010 purchase price, adjusted for changes in market conditions and for the membership fee. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ＿＿ day of April 2013.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on April 15, 2013. The Court filed and entered this Decision on April 15, 2013.*