IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| R & R RANCHES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 130085N |
| | ) | |
| v. | ) | |
| | ) | |
| DESCHUTES COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the real market value of property identified as Account 132747 (subject

property) for the 2012-13 tax year. A trial was held in the Oregon Tax Courtroom in Salem,

Oregon on May 13, 2013. Mark Rubbert (Rubbert) appeared and testified on behalf of Plaintiff.

Sean H. McKenney (McKenney) appeared and testified on behalf of Defendant. Plaintiff's

Exhibits 1 through 17 and Defendant's Exhibits A and B were received without objection.

Defendant's Rebuttal Exhibit A1 was received over Plaintiff's objection that the exhibit was not

exchanged within the time allowed under Tax Court Rule-Magistrate Division 10 C. At the

conclusion of trial, Plaintiff requested an award of the $240 filing fee.

I. STATEMENT OF FACTS

The subject property is a 3.6-acre lot located in the Whispering Pines subdivision

between the cities of Bend and Redmond, Oregon. (Def's Ex A at 2.) Rubbert testified that the

subject property's lot is rocky and covered with sagebrush and juniper. The parties agreed that

the subject property's lot is sloping. As of January 1, 2012, the subject property was improved

with a 1,753-square foot manufactured home built in 1999; a 924-square foot manufactured

home built in 1975; and two storage sheds. (*Id.*) McKenney reported that the 924-square foot

manufactured home was removed after January 1, 2012, and before Plaintiff's purchase of the

subject property in May 2012. (*Id.*) Rubbert testified that the 924-square foot manufactured home was required to be removed under the "county code." He testified that the typical removal cost for a manufactured home is $5,000. McKenney testified that he assigned a "salvage value" of $1,500 to the 924-square foot manufactured home as of January 1, 2012, because it had some value for storage purposes. However, he testified that he agreed with Rubbert that no buyer would pay more for the subject property because of the 924-square foot manufactured home.

On May 4, 2012, the subject property "sold from a lender for $52,000." (Def's Ex A at 2.) "Three days later [May 7, 2012] a deed was recorded for the sale of the [subject] property to [P]laintiff for $70,000." (*Id.*) McKenney does not consider either of those sales to have been "typical market transaction[s]." (*Id.*) Rubbert testified that he is in the business of buying "problem homes" and fixing them up for resale. He testified that he purchased the subject property from someone in the same line of work who had previously purchased the subject property, but did not have time to work on it. Rubbert testified that the cost of removing the 924-square foot structure should be subtracted from his May 2012 purchase price to reflect the fact that the structure was still located on the subject property as of January 1, 2012. Rubbert requests that the 2012-13 real market value of the subject property be reduced to $65,000.

Rubbert testified that, at the time of Plaintiff's purchase, the subject property suffered from significant damage, including pet damage to the floors and carpet; mold on the walls; water damage to the ceiling; and peeling paint. He testified that, additionally, the subject property's septic system was not functioning, the subject property lacked electrical power, and the skirting needed repair. McKenney testified, and Rubbert agreed, that the subject property electrical power may have been connected as of January 1, 2012, and disconnected prior to Plaintiff's purchase. Rubbert provided 14 photographs from May 2012 documenting the poor condition of

the subject property at that time. (Ptf's Exs 1-14.) Rubbert testified that, before beginning work on a property, he cannot tell how much work will be required to fix the property. He testified that, with respect to the subject property, he considered there to be a "50-50 chance" that he would have to tear down the structure. McKenney testified that he did not observe the subject property's condition as of January 1, 2012, so he could not give an opinion on the cost to cure as of January 1, 2012. He testified that he agreed with Rubbert that there was probably no way to know the cost to repair the subject property as of January 1, 2012.

Rubbert offered no evidence of the cost to repair the subject property. However, the parties agreed that Rubbert spent $20,000 on repairs. Rubbert testified that he considers the amount he spent to be irrelevant to the real market value of the subject property because, given his business connections, he is able to purchase materials for "wholesale prices" and receive discounts on labor. Rubbert testified that, when he is considering the purchase of a property to repair, he will try to determine the maximum cost of repairs and will not pay more than the likely sale price after repairs less the estimated maximum cost of repairs. He testified that his opinion at the time he purchased the subject property was that it would sell for $120,000 to $130,000 when the repairs were completed.

Rubbert testified that he identified three comparable sales, all located in the same subdivision as the subject property, that support his requested real market value. Rubbert testified that his sale 1 was a bank sale on May 11, 2012, for $64,000. (*See* Ptf's Ex 15.) He testified that sale 1 was a 2.47-acre, flat, usable lot with a 2,536-square foot manufactured home built in 1999. (*See id.*) Rubbert testified that, before purchasing the subject property, he considered purchasing sale 1. He testified that, in his view, the condition of sale 1 was very similar to that of the subject property. Rubbert testified that sale 2 was a 2.5-acre lot with a

1,024-square foot improvement built in 1984 that sold for $95,500 on September 10, 2012. (*See* Ptf's Ex 16.) Rubbert testified that sale 2 was a flat lot situated on top of a hill with great views. (*See id.*) He testified that the sale 2 structure was in good condition and included all appliances and a large garage with enough room for a boat.

Rubbert testified that sale 3 was a 3.2-acre lot with a 1,440-square foot manufactured structure built in 1973 that sold for $47,500 on June 14, 2012. (*See* Ptf's Ex 17.) Sale 3 was on the market for 296 days. (*Id.*) Rubbert testified that sale 3 included a cistern, but it appeared that the property could be connected to city water. He testified that the sale 3 lot is flat with similar views as the subject property. Rubbert testified that sale 3 also included a small A-frame structure. McKenney provided an "Agent Detail Report" for Rubbert's sale 3, noting that the "Agent-Only [Remarks]" stated "Cistern and septic systems are damaged." (*See* Def's Rebuttal Ex A1.) Rubbert noted that the "Agent-Only [Remarks]" also state "Value is for land only." (*See id.*)

McKenney testified that as of early 2012, there were very few sales in the subject property subdivision, so it was difficult to identify comparable sales or determine market-based adjustments. (*See* Def's Ex A at 13.) He identified three sales that he considered comparable to the subject property if repairs were made and the subject property was brought to "average condition and livable." (*Id.* at 15.) McKenney testified that he drove by his comparable sales, but he did not view the interiors of the sales. He testified that his paired sales analysis yielded confusing results (*i.e.* a superior view decreased price), so he was unable to make market-based adjustments. (*See id.* at 16.) Instead, McKenney's "adjustments were made based on the appraiser's judgment." (*Id.*)

/ / /

McKenney's three sales sold for $152,000 on July 20, 2012; $151,000 on March 23, 2013; and $174,600 on July 12, 2012. (*Id*. at 15.) He made net downward adjustments to each of his sales for adjusted prices of $145,400; $138,400; and $153,200, respectively. (*Id.*) Based on those sales, McKenney determined an indicated value of $146,000 for the subject property. (*Id.*) He subtracted "approximately $20,000" based on the actual cost of repairs reported by Plaintiff and concluded a 2012-13 real market value of $120,000 for the subject property. (*Id.*)

Rubbert testified that, unlike the subject property, McKenney's sale 1 was a horse property. He testified that horse properties can sell for up to $50,000 more than other properties, simply by virtue of being a "horse property." Rubbert testified that McKenney's sale 2 has a layout similar tothe subject property, but very nice paving and landscaping. He testified that McKenney's sale 2 has superior views to the subject property and he thinks it has a heat pump, which is an upgrade. Rubbert testified that McKenney's sale 3 has great landscaping and great views. He testified that McKenney's sales 2 and 3 are somewhat superior to the subject property. Rubbert testified that McKenney's sales sold in bank sales immediately prior to the sales described in McKenney's report.

The 2012-13 tax roll real market value of the subject property was $140,210. (Ptf's Compl at 3.) The board of property tax appeals (BOPTA) reduced the 2012-13 real market value to $110,000. (*Id.*) The 2012-13 maximum assessed value of the subject property was $154,820. (*Id.*) Rubbert verbally amended Plaintiff's Complaint at trial to request a 2012-13 real market value of $65,000 for the subject property. Defendant requests the 2012-13 real market value of the subject property be increased to $120,000. (Def's Ex A at 2.)

/ / /

/ / /

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[1]

The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach. OAR 150-308.205-(A)(2)(a); *Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 252 (2003). The real market value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). If the evidence is inconclusive or unpersuasive, Plaintiff will have failed to meet its burden of proof. *See Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has

---

[1] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2011.

jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.    *Plaintiff's purchase of the subject property*

Plaintiff requests that the 2012-13 real market value of the subject property be reduced to $65,000, based on Plaintiff's May 2012 purchase price of $70,000 less the estimated cost of removing the 924-square foot manufactured home. "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.* (*Kem*), 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted). "In the absence of data indicating that 'the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Bros. Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994) (citations omitted).

Under *Kem*, a sale of the subject property must be recent. 267 Or at 114. "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974). The court finds that the sale of the subject property in May 2012 was recent as of the January 1, 2012, assessment date. McKenney testified that there were very few sales in the Whispering Pine subdivision and market-based adjustments could not be determined. Both parties relied on sales that occurred seven and eight months after the assessment date. The court finds that market conditions as of May 2012 were similar to those as of January 1, 2012.

Under *Kem*, the sale must also be an "arm's length transaction." 267 Or at 114. Here, there is a question whether Plaintiff's purchase was "arm's length." Rubbert testified that he purchased the subject property from another person in the same line of work who did not have time to repair the subject property. There is no evidence that the subject property was listed or marketed prior to Plaintiff's purchase. Because Plaintiff's purchase of the subject property may not have been "arm's length," the court finds the purchase price to be inconclusive and considers other evidence of real market value provided by the parties.

B.      *Sales comparison approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* TC-MD No 020869D, WL 21263620 at *3. OAR 150-308.205-(A)(2)(c) states:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When non-typical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the non-typical market condition."

Rubbert presented evidence of three sales that he considered comparable to the subject property, but made no adjustments to any of his sales. Under OAR 150-308.205-(A)(2)(c), adjustments must be made for differences. Plaintiff's comparable sales evidence does not meet the requirements of OAR 150-308.205-(A)(2)(c). Plaintiff failed to prove by a preponderance of

/ / /

the evidence that the real market value of the subject property was $65,000 as of January 1, 2012.

McKenney presented evidence of three sales that he determined would be comparable to the subject property upon completion of repairs to the subject property. His sales were not, therefore, comparable to the subject property as of January 1, 2012. McKenney testified that he could not determine market-based adjustments, but he nevertheless made adjustments based on his judgment. He provided no evidence in support of his adjustments. McKenney's sales do not bracket the subject property. His net adjustment for each sale was downward, indicating that his sales are all superior to the subject property. "The responsibility of an appraiser is to review and evaluate market data, and base conclusions on such data. Personal conclusions with no basis in actual market data are entitled to little or no weight." *McKee v. Dept. of Rev.*, 18 OTR 58, 64 (2004). Defendant has the burden of proof with respect to its request that the subject property's real market value be increased to $120,000. Defendant failed to prove by a preponderance of the evidence that the real market value of the subject property was $120,000 as of January 1, 2012.

This court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Rubbert testified that, at the time he purchased the subject property, he anticipated that he would be able to sell it for $120,000 to $130,000 after repairs. However, he provided no evidence in support of that estimate. There is no evidence that the subject property's anticipated sale price, reduced by estimated repair costs, should be the real market value as of January 1, 2012. Both Rubbert and McKenney agreed that, as of January 1, 2012, it was not possible to know the cost to repair the subject property. The parties agreed that Rubbert's actual cost to repair the subject property was $20,000. Rubbert testified persuasively

that the actual repair cost of $20,000 was low because he was able to secure deals and discounts. Unfortunately, Rubbert failed to provide any evidence of the cost to repair the subject property and the court cannot speculate as to the cost. The evidence presented does not support a change to the 2012-13 real market value of the subject property determined by BOPTA.

C.     *Plaintiff's request for an award of the $240 filing fee*

Rubbert verbally requested at trial that the court award Plaintiff the $240 filing fee. He did not cite any authority in support of his request. ORS 305.490(1)(a) states that "[p]laintiffs or petitioners filing a complaint or petition in the tax court shall pay the filing fee established under ORS 21.135 at the time of filing for each complaint or petition." Taxpayers may file a Declaration and Application for Waiver of Fee at the time of filing a complaint. There is no provision in the statutes or court rules for a refund of that fee. This court has previously determined that "there is no statutory authority for an award of costs and disbursements in the Magistrate Division of the Oregon Tax Court." *Wihtol v. Multnomah County Assessor*, TC-MD No 120762N, WL 412542 (Jan 30, 2013.) Plaintiff's request for the $240 filing fee is denied.

## III.  CONCLUSION

After careful consideration, the court concludes that Plaintiff failed to prove by a preponderance of the evidence that the real market value of the subject property was $65,000 as of January 1, 2012. The court concludes that Defendant failed to prove by a preponderance of the evidence that the real market value of the subject property was $120,000 as of January 1, 2012. The court finds that the evidence does not support a change to the 2012-13 real market value of the subject property determined by BOPTA. Plaintiff's request for the $240 filing fee is denied. Now, therefore,

/ / /

IT IS THE DECISION OF THIS COURT that, as determined by BOPTA, the real market value of property identified as Account 132747 was $110,000 for the 2012-13 tax year.

IT IS FURTHER DECIDED that Plaintiff's request for the $240 filing fee is denied.

Dated this ____ day of July 2013.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*