IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

OBERDORFER TRUST and )
RICHARD LEE OBERDORFER TRUSTEE, )
)
Plaintiffs, ) TC-MD 130098N
)
v. )
)
DESCHUTES COUNTY ASSESSOR, )
)
Defendant. ) **DECISION**

Plaintiffs appeal the real market value of property identified as Account 184452 (subject property) for the 2012-13 tax year. A trial was held by telephone on June 26, 2013. Richard L. Oberdorfer (Oberdorfer) appeared and testified on behalf of Plaintiffs. Todd Straughn (Straughn), Appraiser, appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1-3 and Defendant's Exhibit A were received without objection.

I. STATEMENT OF FACTS

The subject property is a 2,473-square foot house located on the Green Lakes Loop "within the gated golf course community of Broken Top [in] Bend, Oregon." (Def's Ex A at 2.) "Broken Top * * * is a well-established golf course community. A majority of the sites abut the 18 hole golf course and typically range in size from .25 [acre] to .60 [acre] with a majority of the lots in the .50 acre range." (*Id*.) "The subject property is a .39 acre site, with golf course frontage." (*Id.*) Defendant described the subject property as a "custom built home that was constructed in 1994." (*Id.*) Oberdorfer testified that the subject property was a "spec home" with "no frills" or "personalization," only the "minimal amenities." He testified that custom homes are "fancier" than "spec homes," such as the subject property. Oberdorfer testified that the crawl space under the subject property has standing water from golf course runoff.

Plaintiffs purchased the subject property in June 2012 for $425,000 following foreclosure in October 2011. (Def's Ex A at 3.) The previous owner of the subject property listed it for $825,000 from September 2009 to August 2010 and for $675,000 from August 2010 to February 2011. (*Id.*) In October 2011, the previous owner "transferred the [subject] property to Bank of New York Mellon ET AL with an outstanding balance of $495,000." (*Id.*) The subject property was listed in October 2011 for $555,900 with monthly price decreases to $425,000 in April 2012. (*Id.*) The subject property was listed again in May 2012 for $409,900 and sold to Plaintiffs in June 2012 for $425,000. Oberdorfer testified that a real estate agent told him that one other offer, for $397,000, was made on the subject property. He testified that he previously owned a home in "Fall Creek" and had been looking for a larger home for several years. Oberdorfer testified that, in his opinion, the subject property's real market value was $425,000.

Straughn testified that he disagreed that the June 2012 sale price for the subject property was its real market value as of January 1, 2012. He stated that "[t]he rapid (monthly) reductions [in the subject property listing price was] a sign of a highly motivated seller (the bank), indicating a high desire to liquidate the property." (Def's Ex A at 3.) Straughn reported that the "[t]ypical marketing time for January 2012 was approximately 111 days." (*Id.*) He stated that, with respect to the subject property, "the list price was constantly changing and it is [Straughn's] opinion that the market views these rapid changes as a distressed seller and they wait for the price reductions to either get to a point that is well below the actual market value, or wait for the price reductions to slow." (*Id.*) In Straughn's view, "banks are not buyers and sellers of properties and it is common for a bank or lender to accept an offer that is below market value and even below [that value] they currently have invested in the property." (*Id*. at 4.)

/ / /

Straughn testified that, prior to 2012, foreclosures were prevalent in the Bend area. He testified that, beginning in 2012, foreclosures were no longer typical for the market. Straughn testified that some foreclosure sales after 2012 were representative of the market, but others were lower than market prices and were "good deals." He testified that the subject property sale appears to have been a "good deal." Oberdorfer testified that he agrees with Straughn that, as of mid-2012, most of the foreclosures and short sales had been "resolved." He testified that 2012 was a "transition year" with respect to foreclosures and short sales.

Oberdorfer testified that he talked with a real estate agent who provided him with a list of sales from the same area as the subject property. Oberdorfer testified that he selected three of those sales that were similar in size to the subject property and occurred close to the January 1, 2012, assessment date. His testified that he reviewed each of those sales in a database maintained by Defendant. (*See* Ptfs' Exs 1-3.) Oberdorfer's first sale was a 2,375-square foot property located on the "Fall Creek Loop" that sold for $425,000 in June 2012. (Ptfs' Ex 1.) His second sale was a 2,800-square foot property located on the "Fall Creek Loop" that sold for $430,000 in September 2011. (Ptfs' Ex 2.) Oberdorfer's third sale was a 2,361-square foot property located on "Blue Lake Loop" that sold for $305,000 in January 2012. (Ptfs' Ex 3.) He testified that his first two sales are located within one-half mile of the subject property. Oberdorfer did not make adjustments to any of his sales.

Straughn testified that Plaintiffs' first two sales are located in Fall Creek. He testified that Plaintiffs' sale 3 is not located "behind the gate" at Broken Top; it is located in a public access area. Straughn testified that properties in "Blue Lake," such as Plaintiffs' sale 3, are similar in quality to Fall Creek homes, but typically sell for less because they are not "behind the gate." Straughn testified that properties in "Fall Creek" have, historically, sold for less than

other properties in Broken Top.  Straughn stated that "Fall Creek typically does not compare to the majority of Broken Top because the homes in this area have [] increased home owner dues that cover all of the exterior maintenance of the home.  The subject property reportedly has HOA dues in the amount of $120.00/month, compared to * * * HOA dues of $230/month" reported for a property located in Fall Creek.  (Def's Ex A at 5.)  "The higher HOA dues along with inferior building materials and typically lesser views cause homes to typically sell for less than the other single family homes within Broken Top."  (*Id.*)

Oberdorfer testified that he disagrees with Straughn that Fall Creek houses are less desirable than other Broken Top houses.  He testified that many Fall Creek homes are "lock and leave" second homes that appeal to buyers looking for a second, or vacation home that is easy to access and maintain.  Oberdorfer testified that Fall Creek might be considered a different market than other Broken Top homes.  He testified that there are two "HOA" fees in the Fall Creek loop, which total about $250.  Oberdorfer testified that one of the "HOA" fees applies to all properties in Broken Top and the other is specific to Fall Creek properties; the "HOA" fee specific to Fall Creek covers common area, landscaping, and snow removal.  Oberdorfer testified that the "HOA" fees for the subject property are $125 per month, but do not cover landscaping or snow removal.  He testified that he pays $230 per month seven months of the year for landscaping.

Straughn utilized the sales comparison approach to develop his opinion of the subject property's real market value as of January 1, 2012.  (*See* Def's Ex A at 4.)  He identified three sales as comparable to the subject property.  (*Id.*)  Straughn's sale 1 is a 2,674-square foot property located "[a]cross the golf course" from the subject property that sold for $525,000 in a short sale on February 13, 2012.  (*Id.*)  He determined an adjusted sale price of $510,000 for sale 1.  (*Id.*)  Straughn's sale 2 is a 2,975-square foot property located in Broken Top near sale 1 that

sold for $595,000 on October 4, 2011. (*Id.*) He determined an adjusted sale price of $565,000 for sale 2. (*Id.*) Straughn's sale 3 was the property identified by Oberdorfer's as his sale 1, located in Fall Creek. (*See id.*; Ptfs' Ex 1.) Straughn determined an adjusted sale price of $500,500 for sale 3. (Def's Ex A at 4.)

Straughn made adjustments to his sales for differences including location, view, quality of construction, "room count," gross living area, garage, and "porch/deck." (*Id*. at 4.) He could not determine time adjustments for sales within Broken Top "due to conflicting data," but noted that each of his comparable sales sold within six months before or after the January 1, 2012, assessment date. (*Id.* at 5.) Straughn placed the most weight on his first sale with "additional support provided by sale two." (*Id.*) He gave sale three "minimal to no weight due to the amount of adjustments needed for comparability." (*Id.*) Straughn determined a reconciled value of $525,000 for the subject property. (*Id.*)

The 2012-13 tax roll real market value of the subject property was $597,810. (Ptfs' Compl at 2.) The Board of Property Tax Appeals (BOPTA) reduced the 2012-13 real market value of the subject property to $517,500. (*Id.*) The 2012-13 maximum assessed value of the subject property was $564,870. (*Id.*) Plaintiffs request that the 2012-13 real market value of the subject property be reduced to $425,000, based on Plaintiffs' June 2012 purchase price. (Ptfs' Compl at 1.) Defendant requests that the 2012-13 real market value of the subject property be increased to $525,000. (Def's Ex A at 2.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No

020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[1]

The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach. OAR 150-308.205-(A)(2)(a); *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003). The real market value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). If the evidence is inconclusive or unpersuasive, Plaintiffs will have failed to meet their burden of proof. *See Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

/ / /

/ / /

---

[1] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2011.

A.      *Plaintiffs' purchase of the subject property*

Plaintiffs requests that the 2012-13 real market value of the subject property be reduced to $425,000, based on Plaintiffs' June 2012 purchase price. "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.* (*Kem*), 267 Or 111, 114, 514 P2d 1335 (1973) (citations omitted). "In the absence of data indicating that 'the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Bros. Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994) (citations omitted).

Under *Kem*, a sale of the subject property must be "recent." 267 Or at 114. "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974). Straughn stated in his appraisal report that he could not determine time adjustments for sales within Broken Top. He considered sales that sold up to six months before and after the January 1, 2012, assessment date, including a sale in June 2012. The court finds that market conditions as of June 2012 were similar to those as of January 1, 2012, and the sale of the subject property in June 2012 was recent as of the January 1, 2012, assessment date.

Under *Kem*, the sale must also be a "voluntary, arm's length transaction." 267 Or at 114. Here, there is a question whether Plaintiffs' purchase was a "voluntary, arm's length transaction" because it was purchased following foreclosure. "This court has been reluctant to consider

'foreclosure' sales as 'arm's-length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Voronaeff v. Crook County Assessor*, TC-MD No 110361C, WL 1426847 at *4 (Apr 25, 2012) (citations omitted).

> "There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price. If so, the sale, at best, likely represents the low end of the real market value range, and may have been well below the actual market value of the property."

*Kryl v. Lane County Assessor*, TC-MD No 100192B, WL 1197444 at *2 (Mar 30, 2011). This court has also observed that, "a sale of bank-owned property conducted with such rapidity suggests duress or compulsion on the part of the seller, leading the court to conclude such sales as not indicative of an arm's-length transaction." *Brashnyk v. Lane County Assessor (Brashnyk)*, TC-MD 110308, WL 6182028 at *5 (Dec 12, 2011).

Property purchased through foreclosure may be "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Revenue*, 293 Or 506, 508, 650 P2d 923 (1982) (emphasis in original). "There are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk*, WL 6182028 at *5. "[W]here the majority of the sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985).

Here, the subject property was listed in October 2011 following foreclosure. The listing price in October 2011 was $555,900 and the price was subsequently reduced monthly until April

2012, when it was listed for $425,000. The subject property was listed again in May 2012 for $409,900 and Plaintiffs purchased it in June 2012 for $425,000. Straughn reported that the typical marketing time as of January 1, 2012, was 111 days, whereas the subject property was on the market for over six months (180 days), from October 2011 to April 2012 and again in May 2012. That suggests that the subject property was not sold rapidly as compared with other properties on the market. However, Straughn and Oberdorfer agreed that foreclosures were no longer typical for the subject property's market as of 2012. Furthermore, two other properties in Broken Top each sold close to January 1, 2012, for considerably more than the subject property. Plaintiffs presented no evidence to explain the price discrepancy between the subject property sale and the other sales in Broken Top. Based on the evidence presented, the court is not persuaded that Plaintiffs' purchase price of $425,000 for the subject property in June 2012 was indicative of its real market value as of January 1, 2012.

B.      *Sales comparison approach*

Oberdorfer and Straughn presented evidence of sales that they considered comparable. The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 at *3 (Mar 26, 2003). OAR 150-308.205-(A)(2)(c) states:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition."

Two of Oberdorfer's three sales were located in Fall Creek. Straughn testified that properties in Fall Creek typically sell for less than properties located in Broken Top. Oberdorfer disagreed that properties in Fall Creek are less desirable than properties in Broken Top, but acknowledged that the properties appeal to different buyers and may be in different markets. Thus, there is a question of whether the Fall Creek sales are comparable to the subject property. An additional problem with Oberdorfer's sales is that he did not adjust his sales to be comparable to the subject property, as required by OAR 150-308.205-(A)(2)(c). One of Oberdorfer's comparable sales was also used by Straughn, identified as his sale 3. Straughn determined an adjusted sale price of $500,500 for that sale, but placed minimal weight on it because of its location in Fall Creek. The court is not persuaded that Oberdorfer's three sales support a reduction in the real market value of the subject property.

Straughn also considered three comparable sales, two of which were located in Broken Top. He placed the most weight on his first sale, for which he determined an adjusted sale price of $510,000. Straughn placed secondary weight on his second sale, for which he determined an adjusted sale price of $565,000. Based on his analysis, Straughn requests that the real market value of the subject property be increased from $517,500, as determined by BOPTA, to $525,000. The court finds no basis to increase the real market value to $525,000 based on the comparable sales presented by Straughn. Two of his three sales, including the one that he considered most comparable to the subject property, had adjusted sale prices less than $517,500. The 2012-13 real market value of the subject property determined by BOPTA is supported by the evidence presented and no further change is warranted.

/ / /

/ / /

### III.  CONCLUSION

After careful consideration, the court finds that Plaintiffs' have failed to meet their burden of proof that the 2012-13 real market value of the subject property should be reduced to $425,000, based on Plaintiffs' June 2012 purchase price.  The court further finds that the evidence presented supports the 2012-13 real market value of the subject property determined by BOPTA, $517,500.  Defendant's request that the 2012-13 real market value of the subject property be increased to $525,000 is denied.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

IT IS FURTHER DECIDED that Defendant's request that real market value of property identified as Account 184452 be increased to $525,000 for the 2012-13 tax year is denied.

Dated this ____ day of August 2013.


_____
ALLISON R. BOOMER
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on August 2, 2013. The Court filed and entered this Decision on August 2, 2013.*